# BLAKESLEE ARPAIA CHAPMAN, INC. *v.* EI CON-STRUCTORS, INC., ET AL.
## (15381)

Callahan, C. J., and Borden, Berdon, Norcott, Katz, Palmer and McDonald, Js.

Argued June 4, 1996—officially released January 21, 1997

*Allan J. Kleban*, with whom were *Wesley W. Horton* and, on the brief, *Kimberly M. Canning*, for the appellant-appellee (defendant Aetna Insurance Company).

*William H. Clendenen, Jr.*, with whom, on the brief, was *Nancy L. Walker*, for the appellee-appellant (plaintiff).

*David R. Hendrick*, pro hac vice, and *Frank J. Forgione* filed a brief for the American Subcontractors Association as amicus curiae.

*Jack G. Steigelfest* filed a brief for the Connecticut Defense Lawyers Association as amicus curiae.

*Steven D. Ecker* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

*Richard Blumenthal*, attorney general, and *Carolyn K. Querijero*, assistant attorney general, filed a brief for the attorney general as amicus curiae.

BERDON, J. This appeal[1] involves, among numerous lesser issues, the award of offer of judgment interest pursuant to General Statutes (Rev. to 1983) § 52-192a.[2] The offer of judgment issue raises the following: (1) whether the plaintiff was entitled to such interest when a unified offer of judgment was directed to multiple defendants; (2) whether the plaintiff was entitled to such interest because, subsequent to the filing of the offer, the plaintiff amended its complaint to add a new claim; (3) whether the plaintiff should have been awarded such interest for the period of time this action was stayed pending the outcome of related federal liti-

---

[1] This case previously has been before our Appellate Court. See *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, 32 Conn. App. 118, 628 A.2d 601 (1993) (whether on facts of this case, plaintiff was entitled to prejudgment remedy).

[2] See footnote 33.

gation; and (4) whether the offer of judgment statutes, General Statutes (Rev. to 1983) §§ 52-192a and 52-193, and General Statutes §§ 52-194 and 52-195,[3] treat plaintiffs and defendants so differently as to violate the due process and equal protection guarantees of the federal and state constitutions.

On January 11, 1983, the defendant general contractor EI Constructors, Inc. (EI), and the defendant city of Waterbury (Waterbury) entered into a contract (contract) for the construction of the Waterbury water treatment plant (plant). EI, as principal, and the defendant Aetna Insurance Company (Aetna), as surety, furnished a payment bond in the amount of $21,274,000 pursuant to the contract and as required by General Statutes (Rev. to 1983) § 49-41 et seq.[4] Thereafter, the plaintiff Blakeslee Arpaia Chapman, Inc., entered into a subcontract with EI to perform certain work with respect to the plant (subcontract) for the price of $440,000. EI defaulted on the contract by failing to perform its obligation, and Waterbury took control of the construction of the plant.

The plaintiff thereafter brought this multiple count action for damages arising out of the construction of the plant against EI on the subcontract, against Aetna as surety on the payment bond, and against Waterbury for tortious conduct. The nine counts of the complaint relevant to EI and Aetna are: count one for progress payments under its subcontract pursuant to invoices for July, August and September, 1984; count two for equipment rentals and standby labor costs; count three for rental and liquidation costs of steel sheeting and structured members; count four for the 5 percent retainage held pursuant to the subcontract; count five for extra work; count six for the cost of failing to supply

---

[3] See footnote 34.
[4] See footnotes 11 and 12.

electricity; count seven for unbilled costs and profits under the subcontract; count eight for extra costs for unforeseen construction conditions; and count nine for increased labor costs. The relevant facts for each count that is the subject of this appeal will be discussed when addressing the particular issue.

The trial court, in a thoughtful and comprehensive written opinion, rendered judgment in favor of the plaintiff against EI for $1,506,687.23[5] and against Aetna for $967,338.16.[6] These amounts included interest pursuant

---

[5] EI was defaulted for failure to appear, and the trial court held a hearing in damages. The monetary awards for the plaintiff against EI on each count were as follows:

|  | Damages | Compensatory Interest |
|---|---|---|
| Count one—Progress Payments | $104,002.58 | $109,404.93 |
| Count two—Equipment Rentals | 38,601.00 | - 0 - |
| —Standby Labor | 2,871.00 | - 0 - |
| Count three—Steel Rental and Liquidation | 96,917.90 | - 0 - |
| Count four—Retainage | 10,284.21 | 10,735.41 |
| Count five—Extra Work | 11,217.00 | 11,740.73 |
| Count six—Electricity | 2,217.00 | 2,354.32 |
| Count seven—Costs Not Billed | 11,060.00 | - 0 - |
| —Earned Profits | 17,654.00 | - 0 - |
| —Unearned Profits | 14,510.00 | - 0 - |
| Count eight—Extra Costs, Subsurface Conditions | 111,381.00 | 116,264.20 |
| Count nine—Increased Labor Costs | 2,493.00 | 2,601.80 |
|  | $423,208.69 | $253,101.39 |
| Damages | $423,208.69 |  |
| Compensatory Interest | 253,101.39 |  |
|  | $676,310.08 |  |
| Offer of Judgment Interest (including attorney's fees of $350) | 830,377.15 |  |
| Total | $1,506,687.23 |  |

[6] The monetary awards to the plaintiff against Aetna on each count were as follows:

|  | Damages | Compensatory Interest |
|---|---|---|
| Count one—Progress Payments | $104,002.58 | $109,404.93 |
| Count two—Equipment Rentals | 38,601.00 | - 0 - |
| —Standby Labor | 2,871.00 | - 0 - |
| Count three—Steel Rental and Liquidation | 96,917.90 | - 0 - |

to General Statutes (Rev. to 1983) § 37-3a[7] (compensatory interest) and interest pursuant to § 52-192a (offer of judgment interest). The trial court also rendered judgment in favor of Waterbury. Aetna appealed[8] and the plaintiff cross appealed[9] to the Appellate Court and we transferred both appeals to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).[10] We affirm the judgment of the trial court.

Although the principal issues in this case pertain to the offer of judgment interest pursuant to § 52-192a,

| | | |
|---|---|---|
| Count four—Retainage | 10,284.21 | 10,735.41 |
| Count five—Extra Work | 11,217.00 | 11,740.73 |
| Count six—Electricity | 2,217.00 | 2,354.32 |
| Count seven—Costs Not Billed | 11,060.00 | - 0 - |
| —Earned Profits | 17,654.00 | - 0 - |
| —Unearned Profits | - 0 - | - 0 - |
| Count eight—Extra Costs, Subsurface Conditions | - 0 - | - 0 - |
| Count nine—Increased Labor Costs | 2,493.00 | 2,601.80 |
| | $297,317.69 | $136,837.19 |
| Damages | $297,317.69 | |
| Compensatory Interest | 136,837.19 | |
| | $434,154.88 | |
| Offer of Judgment Interest (including attorney's fees of $350) | 533,183.28 | |
| Total | $967,338.16 | |

[7] See footnote 28.

[8] Aetna appealed from the judgment with respect to the trial court's award of damages in counts one, two, three, four and seven, as well as the awards of compensatory interest and offer of judgment interest. See footnote 6.

[9] The plaintiff cross appealed from the judgment against Aetna with respect to the failure to award compensatory interest in counts two, three and seven, the failure to award amounts claimed for unearned profits in count seven, and the failure to award extra costs incurred for unforeseen construction conditions in count eight. See footnote 6. The plaintiff did not appeal from the judgment in favor of Waterbury.

[10] This case was argued on June 4, 1996, before a panel of the court consisting of five justices. Thereafter, on July 30, 1996, this court decided, sua sponte, to reconsider the case en banc and ordered the parties to submit supplemental briefs limited to the offer of judgment issues, including: "(1) Is a single offer of judgment made by one plaintiff to multiple defendants a valid offer of judgment under General Statutes § 52-192a and Practice Book §§ 345–350?; (2) Is a single offer of judgment made by several plaintiffs

several other issues raised by Aetna on the appeal and the plaintiff on the cross appeal must first be addressed. We begin our analysis with the appropriate standard of review. On appeal, our function is not to retry the facts. *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 16, 662 A.2d 89 (1995). Rather, "[t]he trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Groton* v. *Yankee Gas Services Co.*, 224 Conn. 675, 691, 620 A.2d 771 (1993).

The liability of Aetna under the payment bond will be reviewed in part I of this opinion, and the issues of compensatory interest and offer of judgment interest will be reviewed in parts II and III, respectively.

I

LIABILITY OF AETNA

General Statutes (Rev. to 1983) §§ 49-41 through 49-43, which provide for the furnishing of bonds guaranteeing payment (payment bonds) on public works construction projects, were "enacted to protect workers and materials suppliers on public works projects who cannot avail themselves of otherwise available remedies such as mechanic's liens." *Herbert S. Newman & Partners* v. *CFC Construction Ltd. Partnership*, 236

---

to one defendant a valid offer of judgment under General Statutes § 52-192a and Practice Book §§ 345–350?; and (3) Do the offer of judgment statutes, General Statutes § 52-192a and General Statutes §§ 52-193 through 52-195, treat plaintiffs and defendants so differently as to violate the due process and equal protection guarantees of the federal and state constitutions?" Additionally, the court solicited amicus curiae briefs.

Conn. 750, 757, 674 A.2d 1313 (1996); see *National Fire-proofing Co.* v. *Huntington*, 81 Conn. 632, 633, 71 A. 911 (1909) (mechanic's lien cannot lie against the state or any of its subdivisions). Section 49-41[11] requires that the general contractor provide a payment bond with surety to the state or governmental subdivision, which bond shall guarantee payment to those who supply labor and materials on a public works project. See *Nor'-easter Group, Inc.* v. *Colossale Concrete, Inc.*, 207 Conn. 468, 471, 542 A.2d 692 (1988). Section 49-42[12] provides

---

[11] General Statutes (Rev. to 1983) § 49-41 provides in relevant part: "(a) Before any contract exceeding one thousand dollars in amount for the construction, alteration or repair of any public building or public work of the state or of any subdivision thereof is awarded to any person, that person shall furnish to the state or the subdivision a bond in the amount of the contract which shall be binding upon the award of the contract to that person, with a surety or sureties satisfactory to the officer awarding the contract, for the protection of persons supplying labor or materials in the prosecution of the work provided for in the contract for the use of each such person . . . .

"(b) Nothing in this section or sections 49-41a to 49-43, inclusive, shall be construed to limit the authority of any contracting officer to require a performance bond or other security in addition to the bond herein referred to . . . ."

[12] General Statutes (Rev. to 1983) § 49-42 provides in relevant part: "(a) Every person who has furnished labor or material in the prosecution of the work provided for in such contract in respect of which a payment bond is furnished under the provisions of section 49-41 and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which the claim is made, has the right to sue on the payment bond for the amount, or the balance thereof, unpaid at the time of institution of the suit and to prosecute the action to final execution and judgment for the sum or sums justly due him. Any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing the payment bond shall have a right of action upon the payment bond upon giving written notice to such contractor within ninety days from the date on which the person performed the last of the labor or furnished or supplied the last of the material for which the claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed. . . .

"(c) The word 'material' as used in sections 49-41 to 49-43, inclusive, includes the rental of equipment used in the prosecution of work provided for in the contract."

that any person who has performed work or supplied materials on a public works project, but who has not received full payment for such materials or work, may enforce his right to payment under the payment bond.

This legislation, known as the "Little Miller Act" (act), "was patterned after federal legislation popularly known as the Miller Act; 40 U.S.C. §§ 270a through 270d; and, therefore, we have regularly consulted federal precedents to determine the proper scope of our statute. *American Masons' Supply Co.* v. *F. W. Brown Co.*, [174 Conn. 219, 223–24, 384 A.2d 378 (1978)]; *Pittsburgh Plate Glass Co.* v. *Dahm*, [159 Conn. 563, 567–68, 271 A.2d 55 (1970)]; *International Harvester Co.* v. *L. G. DeFelice & Son, Inc.*, [151 Conn. 325, 332–34, 197 A.2d 638 (1964)]." *Okee Industries, Inc.* v. *National Grange Mutual Ins. Co.*, 225 Conn. 367, 374, 623 A.2d 483 (1993). "The federal precedents, like our own, counsel liberal construction of statutory requirements other than those relating to specific time constraints." Id.; see also *Herbert S. Newman & Partners* v. *CFC Construction Ltd. Partnership*, supra, 236 Conn. 757; *International Harvester Co.* v. *L. G. DeFelice & Son, Inc.*, supra, 333. As the United States Supreme Court has stated, the federal Miller Act is "highly remedial in nature . . . [and] entitled to a liberal construction and application in order properly to effectuate the [legislative] intent to protect those whose labor and materials go into public projects." *Clifford F. MacEvoy Co.* v. *United States ex rel. Calvin Tomkin's Co.*, 322 U.S. 102, 107, 64 S. Ct. 890, 88 L. Ed. 1163 (1944).

Although the surety's liability on the bond must be "at least coextensive with the obligation imposed by the [Miller] Act"; *Herbert S. Newman & Partners* v. *CFC Construction Ltd. Partnership*, supra, 236 Conn. 758; the "statutory requirements establish only a floor of protection beneath which the coverage of a payment bond cannot fall, rather than an upper limit upon the

scope of a bond's coverage." Id., 757. In other words, the provisions of the payment bond may create more extensive liability for the surety than that required by the act. Because the payment bond was furnished by the surety, if there is any ambiguity, "it must be interpreted most strongly against [the surety]." (Internal quotation marks omitted.) Id., 759. With these principles in mind, we review the liability issues raised by Aetna, as well as certain amounts awarded by the trial court.

## A

### Progress Payments and Retainage

In accordance with the terms of the subcontract, the trial court awarded the plaintiff damages against EI in the amount of $114,286.79, for its unpaid invoices of July, August and September of 1984 (progress payments) under count one and for the 5 percent retainage withheld on previous payments under count four. Pursuant to the payment bond,[13] the trial court awarded the plaintiff like sums against Aetna.

---

[13] The payment bond provided in relevant part: "NOW THE CONDITION OF THIS OBLIGATION IS SUCH THAT if [EI] shall well and truly keep and faithfully perform all the terms and conditions of said contract on its part to be kept and performed (including guarantee and maintenance provisions therein), and shall pay for all materials, and for all labor performed, and for the rental or hire of vehicles, power shovels, concrete mixers, tools and other appliances, and equipment used or employed in the execution of said Contract, and shall indemnify and save harmless the said City of Waterbury, Connecticut, as therein stipulated, then this obligation shall be of no effect; otherwise it shall remain in full force and virtue.

"AND THE SAID Surety, for value received, hereby stipulates and agrees that no change, extension of time, alteration or addition to the terms of the Contract or to the work to be performed thereunder or the specifications accompanying the same shall in any wise effect its obligations on this bond and it does hereby waive notice of any such change, extension of time, alteration or addition to the terms of the Contract or to the work or to the Specifications.

"This Bond is made for the use and benefit of all persons, firms and corporations, who may furnish any material or perform any labor for or on account of said Contract, or rent or hire out any appliances and equipment used or employed in the execution of this Contract, and they and each of

A clause in the subcontract provided that the plaintiff was to be paid when EI received payment from Waterbury.[14] In the construction industry this is commonly referred to as a "pay-when-paid" clause. It is not disputed that the plaintiff's invoices submitted to EI were in accordance with the payment values assigned to the work in the subcontract, and that the work was performed. Aetna, however, argues that EI did not get paid for this work from Waterbury because the project engineer, who was authorized to approve payments for Waterbury, placed a lesser value on the work than that provided in the subcontract. Aetna argues that, as a result of the "pay-when-paid" clause of the subcontract, a lesser sum is due to the plaintiff. See *Grenier* v. *Compratt Construction Co.*, 189 Conn. 144, 148, 454 A.2d 1289 (1983) ("contracting parties are free to impose conditions upon contractual liability").

The plaintiff and the amicus American Subcontractors Association advance several arguments for not enforcing such a clause. These arguments can be summarized as follows: (1) a "pay-when-paid" clause, which transfers the credit risk incurred by the general contractor, can only be enforced if the language in the subcontract is clear and unequivocal and, in this case, the subcontract language was equivocal; see *Statesville Roofing & Heating Co.* v. *Duncan*, 702 F. Sup. 118, 121 (W.D.N.C. 1988); *Schuler-Haas Electric Corp.* v. *Aetna Casualty & Surety Co.*, 49 App. Div. 2d 60, 64, 371 N.Y.S.2d 207 (1975), aff'd, 40 N.Y.2d 883, 357 N.E.2d 1003, 389 N.Y.S.2d 348 (1976); (2) such a clause does not relieve contractors of their duty to pay the subcon-

them are hereby made obligees hereunder the same as if their own proper respective names were written herein as such, and they and/or each of them may proceed or sue hereon."

[14] The subcontract in this case provided that "[p]ayment of the approved portion of the Subcontractor's monthly estimate shall be conditioned upon receipt by the Contractor of his payment from the Owner."

tractor because it conflicts with the contract read in its entirety or the intent of the parties; see *Statesville Roofing & Heating Co.* v. *Duncan*, supra, 119 (absent special circumstances, majority view is that conditional payment clauses are given "no weight"; courts look to parties' intent "in light of the situation of the parties, the end which they sought to accomplish, and against the background of customary practices in the construction industry" [internal quotation marks omitted]); *Gulf Construction Co.* v. *Self*, 676 S.W.2d 624, 627 (Tex. App. 1984) (in absence of limiting clause, whether contract provision is condition precedent must be gathered from contract as whole and parties' intent); (3) "pay-when-paid" clauses are not enforceable when the conduct of the contractor is the cause of the failure; see *Midland Engineering Co.* v. *John A. Hall Construction Co.*, 398 F. Sup. 981, 995 (N.D. Ind. 1975); *Star Contracting Corp.* v. *Manway Construction Co.*, 32 Conn. Sup. 64, 68, 337 A.2d 669 (1973); (4) such a clause merely sets the time for payment, and "should be viewed only as postponing payment by the general contractor for a reasonable time after requisition . . . so as to afford the general contractor an opportunity to obtain funds from the owner"; *A. J. Wolfe Co.* v. *Baltimore Contractors, Inc.*, 355 Mass. 361, 366, 244 N.E.2d 717 (1969); and (5) that a "pay-when-paid" clause is a condition precedent that is contrary to public policy and therefore unenforceable. *United States ex rel. T.M.S. Mechanical Contractors, Inc.* v. *Millers Mutual Fire Ins. Co.*, 942 F.2d 946, 949 n.6 (5th Cir. 1991) ("pay-when-paid" clause in subcontract did not preclude plaintiff's recovery because under Miller Act liability of contractor is limited to subcontractor); *Statesville Roofing & Heating Co.* v. *Duncan*, supra, 119 ("[t]he trend now in most states is that, absent special circumstances, [a pay-when-paid clause] is given no weight"); *Gulf Construc-*

*tion Co.* v. *Self,* supra, 627 ("it is a rule of construction that a forfeiture, by finding a condition precedent, is to be avoided when possible under another reasonable reading of the contract").

Nevertheless, we need not determine the enforceability of the "pay-when-paid" clause because the trial court specifically found that EI was paid by Waterbury "all sums" that were due it, including sums for the work completed by the plaintiff. In other words, EI was paid for the work performed by the plaintiff, albeit based on a different schedule of values than those agreed to by the plaintiff and EI in the subcontract. Although the project engineer for Waterbury disallowed some of the value for the work performed, it is the subcontractual value that the plaintiff and EI placed on the work performed that controls. Aetna does not claim that the trial court's findings that the work was performed and that the subcontract provided for the payment claimed by the plaintiff were made without evidence or that these findings were clearly erroneous.[15] We therefore conclude that the trial court correctly awarded the plaintiff damages against Aetna under the payment bond in the amount of $114,286.79 under counts one and four for the July, August and September invoices and the retainage.

B

Earned and Unearned Profits

The trial court found under count seven that the plaintiff had earned profits of $17,654 on the work it had performed pursuant to the subcontract as of Sep-

---

[15] Aetna also claims that EI was excused from paying these invoices and the retainage because a condition in the subcontract required approval by EI and Waterbury's project engineer. Because this argument was raised before the trial court only in the context of whether the "pay-when-paid" clause excused payment, we decline to review this claim on appeal. See *Skrzypiec* v. *Noonan,* 228 Conn. 1, 14–15, 633 A.2d 716 (1993).

tember 14, 1984,[16] and that it proved lost unearned profits of $14,510 on the work it would have performed absent EI's breach of contract. The court awarded both of these sums to the plaintiff as damages against EI. The trial court, however, found Aetna liable as surety only for earned profits of $17,654. Aetna argues that profits, whether earned[17] or unearned, are not recoverable, while the plaintiff argues that both are recoverable.

The trial court allowed recovery of the earned profits of $17,654 under the provisions of § 49-42. We agree that the plaintiff is entitled to recover lost profits for work actually performed. As the Fifth Circuit Court of Appeals noted, "[i]f such a contractor cannot include a profit, he would not be in business." *Price* v. *H. L. Coble Construction Co.*, 317 F.2d 312, 317 (5th Cir. 1963) (holding under Alabama's version of Miller Act that subcontractor may recover contract price including profits for work performed); see *United States ex rel. Martin Steel Constructors, Inc.* v. *Avanti Constructors, Inc.*, 750 F.2d 759, 762 (9th Cir. 1984) (subcontractor's steel supplier entitled to collect unpaid amounts under its contract, which includes profits); *United States ex rel. Woodington Electric Co.* v. *United Pacific Ins. Co.*, 545 F.2d 1381, 1383 (4th Cir. 1976) (surety liable for subcontract price including profit on labor and materials provided); *Hensel Phelps Construction Co.* v. *United States ex rel. Reynolds Electrical & Engineering Co.*, 413 F.2d 701, 704 (10th Cir. 1969) (under Miller Act, plaintiff entitled to recover reasonable value of services and materials for work performed, including profit and overhead); *Arthur N. Olive Co.* v. *United States ex rel. Marino*, 297 F.2d 70, 73 (1st Cir. 1961) (subcontractor

---

[16] Waterbury notified the plaintiff and EI to discontinue all work on the plant, effective at 4:30 p.m. on September 14, 1984.

[17] In its brief, Aetna argues, without citation to any authority, that profits on work performed are not recoverable.

entitled to recover under Miller Act value of extra work performed, which includes profits).

Conceding that federal jurisdictions allow for lost profits on work performed, Aetna attempts to distinguish profits on work performed pursuant to the provisions of the subcontract from profits on additional work performed outside the subcontract. Aetna claims that the plaintiff was improperly allowed profits for work performed outside the subcontract. Relying on *Price* v. *H. L. Coble Construction Co.*, supra, 317 F.2d 312, it argues that recovery is measured by the contract sum and, therefore, the surety is liable only for that profit included in the contract sum. We reject this distinction.

Aetna's reliance on *Price* is misplaced. In that case, the only issue before the court was whether the plaintiff was entitled to a contract sum that included profits.[18] The *Price* court, however, noted that "even in the case of extra work furnished by a subcontractor without any stipulated sum, profits are included in his quantum meruit recovery." Id., 318. The court cited with approval to cases that had rejected the argument that a subcontractor is not entitled to profit on extra work and held instead that "a subcontractor's recovery under the Miller Act for extra work performed, in the absence of any specified price or sum, 'should be the reasonable value of the work and materials furnished plus overhead and profits.' " Id., quoting *Continental Casualty Co.* v. *Schaefer*, 173 F.2d 5, 8 (9th Cir. 1949).

Furthermore, the distinction that Aetna espouses would be contrary to the liberal interpretation that we must afford the act in order to protect the intended

[18] The court noted that the written portion of the contract was incomplete and relied on the plaintiff's testimony as to the nature of the profit sharing agreement in the "partly oral and partly written" contract. *Price* v. *H. L. Coble Construction Co.*, supra, 317 F.2d 322 n.14.

beneficiary, in this case the plaintiff. Accordingly, we reject the distinction and conclude that the trial court correctly awarded the plaintiff earned profits of $17,654 against Aetna under count seven.

In its cross appeal, the plaintiff seeks lost profits for work not performed that it would have earned had it been able to complete its subcontract. The trial court correctly held that "[f]uture loss of profits are not recoverable from a Miller Act surety."[19] See *United States ex rel. Heller Electric Co.* v. *William F. Klingensmith, Inc.*, 670 F.2d 1227 (D.C. Cir. 1982). The plaintiff claims, however, that Aetna also assumed responsibility under the payment bond[20] for damages caused by EI's breach of contract, including profits the plaintiff would have earned had it performed under the subcontract.[21]

The plaintiff does not point to any language in the bond to support this proposition. Instead, the plaintiff relies on related litigation in the United States District Court for the District of Connecticut,[22] wherein the court concluded that "Aetna is liable according to the same standard by which the court has found EI liable." As Aetna notes, however, the District Court was referring to an unrelated issue, and did not address the scope of Aetna's obligations under the payment bond. We do not find, after conducting an independent analysis of the bond, any language that supports the plaintiff's argu-

[19] Our research failed to disclose any jurisdiction that has allowed recovery of unearned profits under the Miller Act. Further, the language and purpose of the act, requiring payment for work *performed* or materials *supplied*, preclude such recovery. See General Statutes (Rev. to 1983) § 49-42 (a).

[20] See footnote 13.

[21] The trial court did not separately analyze the bond to determine whether it provided coverage broader than that required by statute. See *Herbert S. Newman & Partners* v. *CFC Construction Ltd. Partnership*, supra, 236 Conn. 755.

[22] At the time the plaintiff commenced the present action, EI instituted an action in federal court claiming, inter alia, that Waterbury's termination of the contract was wrongful.

ment. We therefore affirm the trial court's decision that the plaintiff is not entitled to profits on work not performed under count seven.

## C

### Rental Value of Equipment, Standby Labor Costs, Steel Sheeting and Unbilled Costs

Aetna argues that it is not liable under § 49-42 for the rental value of the plaintiff's equipment that was not actually used in the project, for standby labor costs, for the rental and liquidation values of steel sheeting and structural members, and for the cost of work performed but not billed. The plaintiff argues that the trial court correctly held Aetna liable for these items of "labor and material" furnished under the contract, under both § 49-42 and the payment bond.[23] We agree with the plaintiff.

### 1

### Rental Value of Idle Equipment

We address first the question of whether the plaintiff may recover the lost use value of its equipment that was seized by Waterbury. The trial court, in concluding that the plaintiff was entitled to $38,601 from EI for the rental cost of the seized equipment, found: "The plaintiff worked on this job from May, 1984, until [September 14, 1984], when [Waterbury] notified the plaintiff that EI had been ordered to discontinue all work, and that the plaintiff's access to the site was revoked. EI did not terminate [its] contract with the plaintiff in accord with the termination provision of [the subcontract]. The plaintiff kept workers on standby, and until mid October, [Waterbury], by authority of [the contract], impounded equipment and materials of the plaintiff.

---

[23] See footnote 13. The trial court properly noted that EI's duties under the contract were incorporated into Aetna's payment bond.

The plaintiff was not paid for costs of its labor and equipment on standby. . . . This equipment was held for [Waterbury's] and Aetna's use during negotiations concerning completion of the project. As soon as reasonably possible after the equipment was released, the plaintiff removed it and began devoting it to other jobs. The plaintiff has charged [Associated Equipment Distributors] rates for idle time for the impounded equipment as required by [the contract],[24] without adjustment for lack of wear and tear while the equipment was idle." (Citations omitted.) The trial court concluded that "[t]he equipment was on site and available for use, and therefore covered under § 49-42."

"Material," as the term is used in the act, includes equipment. Section 49-42 (c) specifically provides that " 'material' . . . includes the rental of equipment used in the prosecution of work provided for in the contract." Aetna, however, argues that it is not liable under either § 49-42 or its payment bond for damages arising out of construction delays for the lost use value of the plaintiff's equipment that was not actually used in the project. We disagree. The subcontractor is entitled to compensation from the surety under the act for equipment available for use on the project site, even when through no fault of its own the equipment remains idle.

A number of federal courts have taken a similar approach under the Miller Act. See *United States ex rel. Heller Electric Co.* v. *William F. Klingensmith, Inc.*, supra, 670 F.2d 1232 ("a surety is liable for the value of material and services provided at the time they were provided, and hence, the surety is liable for delay damages"); *United States ex rel. D & P Corp.* v. *Transamerica Ins. Co.*, 881 F. Sup. 1505, 1509 (D. Kan. 1995)

---

[24] The contract provided that "[t]he equipment rental charge shall be prorated on the basis of the monthly rental rates compiled by the Associated Equipment Distributors."

(plaintiff may recover equipment rental as use value of owned equipment under Miller Act); see also *United States ex rel. Mississippi Road Supply Co. v. H. R. Morgan, Inc.*, 542 F.2d 262, 268–69 (5th Cir. 1976), cert. denied, 434 U.S. 828, 98 S. Ct. 106, 54 L. Ed. 2d 86 (1977) (machinery need not be in continual use for supplier to recover rentals under Miller Act); *United States ex rel. Astro Cleaning & Packaging Corp. v. Jamison Co.*, 425 F.2d 1281, 1283–84 (6th Cir. 1970) (subcontractor awarded expenses for its idle equipment that contractor had refused to release); *Friebel & Hartman, Inc. v. United States ex rel. Codell Construction Co.*, 238 F.2d 394, 395 (6th Cir. 1956) (rental equipment available for use was "used" within meaning of Miller Act).

Aetna also claims that if it is liable for the lost use value of the equipment, the trial court's award of damages was excessive. Aetna does not dispute that the basis of the award of damages was the rates charged by the Associated Equipment Distributors rental guide as provided in the contract. See footnote 24. Rather, Aetna argues that the rental guide is to be used to price extra work and that the amount should have been discounted to reflect the lack of wear and tear because the equipment was idle. See *White Oak Corp. v. Dept. of Transportation*, 217 Conn. 281, 295, 585 A.2d 1199 (1991) (some reduction from blue book rental rates required by law due to lack of wear and tear of idle equipment). In *White Oak Corp.*, we found that the "Standard Schedule of Equipment Rental Rates," or blue book rates, used for measuring extra and cost-plus work performed did not "take into account the fact that machines standing idle do not suffer wear and tear." Id., 294. In this case the trial court, however, found that the Associated Equipment Distributors rate was "portal to portal thereby allowing for idle time . . . ." The trial court further found that "there is no provision in the [Associated Equipment Distributors]

Manual for idle time reduction, nor is it the industry practice to reduce [the] Manual rates for idle time." Aetna does not challenge these findings. Accordingly, we reject Aetna's claim that it is entitled to a discount for the lack of wear and tear and hold that the trial court properly awarded the plaintiff damages of $38,601 against Aetna for the lost use value of the impounded equipment under count two.

## 2

### Standby Labor

The trial court also concluded that EI owed the plaintiff $2871 for the cost of actual standby labor because the plaintiff acted in good faith when it kept workers available and was therefore entitled to recover these costs under both § 49-42 and the payment bond. Aetna argues that that award should be rejected because the laborers did nothing in furtherance of the project, and that this claim is therefore not within the scope of § 49-42.

The parties have provided sparse analysis on this claim. We reiterate, however, the guiding principle of § 49-42—subcontractors are to be reimbursed the value of labor and materials provided on a public works project. Although the laborers may not have been engaged actively in project activities, they were "available for use" in the same sense that the plaintiff's idle equipment was available for use. We therefore hold that the trial court correctly found Aetna liable under § 49-42 for the cost of standby labor in the amount of $2871 under count two.

## 3

### Steel Rental and Liquidation

The plaintiff also claims payment for steel provided to EI under the contract that was never returned. The

trial court found the following facts with respect to the impounded steel. "From [September 15, 1984, to March 15, 1985], the plaintiff lost the use of its steel which was in the cofferdam, and therefore is entitled to the fair rental value as stated in the contract. On [March 15, 1985], the plaintiff found out that it could not take back its steel, since it was being turned over to EI's successor, so in accord[ance] with [the contract], the plaintiff liquidated the steel for its full value of $72,410. EI owes the plaintiff . . . total rental of $24,507.90,[25] plus the liquidation value of $72,410. The total amount due the plaintiff is $96,917.90 for rental and liquidation."

The trial court also determined that, "[a]s a supplier, the plaintiff is entitled to recover from Aetna the rental costs incurred from work stoppage on September 14, 1984 until March 15, 1985, when it became clear this steel would not be returned. . . . [Waterbury] first took possession of [the] plaintiff's steel under the 'abandonment or delay' section of [the contract]. Then, on March 15, 1985, [Waterbury] assumed ownership of the steel and made it clear that it did not intend to return it. At that point Aetna became liable for the liquidation value of the steel at the contract price of $650.00 a ton."

With respect to the trial court's finding that the steel rental from September 14, 1984, until March 15, 1985, totaled $24,507.90, Aetna argues that the trial court improperly focused on the plaintiff as a subcontractor and/or supplier, rather than on the type of damage being claimed—loss of use value of the steel sheeting during a job delay. Aetna bases this characterization on the original intention of EI and the plaintiff, which was that the plaintiff would use the steel to install and then

[25] The trial court found that EI owed the plaintiff the following rental amounts: on the invoice of October 24, 1984, rental of $18,269.50; on the invoice of November 21, 1984, rental of $1559.60; on the invoice of December 14, 1984, rental of $1559.60; on the invoice of January 17, 1985, rental of $1559.60; and on the invoice of March 8, 1985, rental of $1559.60.

remove a cofferdam. Aetna states that this claim is identical to the plaintiff's claim for lost use value of equipment. We agree that the issue is the same. Accordingly, as we discussed in part I C 1, we disagree with Aetna that the trial court improperly calculated steel rental and liquidation damages.

Consonant with our above analysis on the equipment claim, we reiterate that § 49-42 (c) defines "material" to include "the rental of equipment used in the prosecution of work provided for in the contract." It is uncontroverted that the plaintiff supplied the steel sheeting and structures for use in the project to build a cofferdam. Because the steel sheeting and structures were used in this construction pursuant to the contract, they are equipment for which the plaintiff may recover the lost use value in the amount of $24,507.90 for the period of impoundment under count three. The trial court correctly calculated the value of the steel during this period in accordance with its fair rental value as stated in the contract.

With respect to the liquidation value of the steel of $72,410 as of March 15, 1985, Aetna argues that it cannot be held liable for events that occurred months after the contract terminated. It does not dispute the fact that the steel was taken by Waterbury on March 15, 1985, pursuant to the terms of the contract, and was used by EI's successor for the completion of the project. Aetna, however, argues that the steel was not used in the execution of the contract or by EI, the principal on its bond.

We conclude that Aetna is liable to the plaintiff for the liquidation value of the steel under the terms of its payment bond. See *Herbert S. Newman & Partners* v. *CFC Construction Ltd. Partnership*, supra, 236 Conn. 755. The payment bond remained in full force following EI's breach of contract. It provided that in the event that

EI did not "well and truly keep and faithfully perform all the terms and conditions of said contract on its part to be kept and performed . . . and . . . pay for all materials . . . it shall remain in full force and virtue." Thus, as the trial court noted, "[u]nder the explicit terms of its bond, Aetna's obligation is released only if EI fully performs [the contract], including paying for all labor and materials, and since EI did not fully perform and pay for the plaintiff's labor and materials, Aetna is liable under its bond . . . ."

It is beyond dispute that EI did not fully perform the contract. Aetna's argument that it cannot be held liable for events that occurred months after the contract terminated, including Waterbury's impoundment of the plaintiff's steel, is therefore contrary to the plain language of its bond.[26] Although all parties anticipated that

---

[26] Aetna also distinguishes between steel sheeting and steel bracing, as well as steel installed in the blister. Aetna argues that the trial court improperly awarded liquidation costs for both steel sheeting and steel bracing, where the contract only allowed recovery of extra work for steel sheeting left in place, and not for the 34.23 tons of steel bracing. Aetna points to the different physical and economic characteristics of sheeting and bracing, and argues that the trial court ignored the plain meaning of the contract language that only allows for compensation of steel sheeting. Therefore, Aetna states, the plaintiff's recovery must be reduced by $22,249.50 (34.23 tons of steel bracing at $650 per ton). The plaintiff argues that the contract included both sheeting and bracing in the term "steel sheeting" because the contract provided that "[t]he quantity of the steel sheeting to be paid for under the unit price . . . shall be the number of tons of *steel* actually left in place as ordered by the Engineer." (Emphasis added.) The plaintiff points out that the subcontract between EI and the plaintiff required the plaintiff to supply and install steel sheeting and bracing for the cofferdam. An expert testified that it was acceptable for the plaintiff to charge the same rental values for the steel sheeting and bracing. Although this expert took issue with using the same liquidation values for both sheeting and bracing, the trial court reasonably could have concluded that the parties intended to assign the same values. The trial court reasonably could have inferred this based upon evidence that it was acceptable to assign the same rental value for both sheeting and bracing, and the absence of a different liquidation value for the bracing in the contract. Accordingly, we affirm the trial court's finding as to the liquidated costs.

With respect to the steel installed in the blister, Aetna argues that it is not liable for payment of steel installed for the plaintiff's convenience, relying

the steel would be returned to the plaintiff, Waterbury's assumption under the contract of ownership of the steel on March 15, 1985, precluded its return. The steel supplied by the plaintiff is therefore included in the contract provision that "[t]he quantity of the steel sheeting to be paid for under the unit price . . . [is] the number of tons of steel actually left in place as ordered by the Engineer."

Furthermore, Aetna received the benefit of the steel. The trial court found that Waterbury's "use of the steel reduced the completion costs [of the plant] for which Aetna was responsible, and Aetna has been credited with the costs of the plaintiff's steel. Aetna is therefore liable for steel rental of $24,507.90 and liquidation of $72,410.00, a total of $96,917.90." Aetna disputes the trial court's finding that it benefited from Waterbury's use of the steel, stating that there is no evidence of any effect the plaintiff's steel had on the negotiated settlement between Aetna and Waterbury. Aetna, however, overlooks the evidence before the trial court that supports its findings that the contract between Water-

on the contract provision that provided: "Steel sheeting left in place for the convenience of the Contractor will not be measured for payment." Aetna points to testimony by the plaintiff's president that the steel sheeting used for the blister was installed for the plaintiff's convenience, and argues that this steel was necessarily left in place for the plaintiff's convenience. Accordingly, Aetna argues, the amount of judgment must be reduced by $15,379 (23.66 tons of sheeting used in the blister at $650 per ton). The plaintiff notes that this contract language exempts payment for steel *left in place* for its convenience, not that which is installed for its convenience. The contract, however, provides for payment of all "steel actually left in place as ordered by the Engineer." The plaintiff was ordered to leave all of its steel in place, including the steel sheeting used in the blister. Furthermore, it was reasonable for the trial court to conclude that Aetna had received a benefit by means of the reduced costs of project completion due to the use of the steel by EI's successor and the commensurate reduction in costs to Aetna. We agree with the plaintiff that the liquidation value of the steel used in the blister is recoverable under the payment bond. Aetna's argument that steel installed for a contractor's convenience is necessarily left for its convenience, regardless of intervening circumstances, has no merit.

bury and EI's successor contractor provided that the successor contractor use the steel in place and omit any costs for the steel in its bid, and that Waterbury's use of the steel reduced the completion costs for which Aetna was liable. On the basis of these findings, the trial court reasonably could have inferred that Aetna received the benefit of the steel liquidation cost. We affirm the trial court's award against Aetna for liquidation value of the steel in the amount of $72,410 under count three.

4

Unbilled Costs

The trial court concluded that the plaintiff was entitled to $11,060 in costs incurred but not billed as a result of EI's breach of contract. Although its findings with respect to this issue are not extensive, the trial court did find that "[t]he plaintiff would eventually have been paid these costs as part of the full contract price. If there had been no default, the plaintiff would have received all costs plus profit. The $11,060 of labor and materials furnished is a sum 'justly due' under [§] 49-42." We agree.

Aetna argues, inter alia, that payment is not required under § 49-42 because the $11,060 was not "a sum 'justly due'" under the contract. Aetna, however, does not contest that this sum was expended on labor and materials for the construction of the plant, nor does Aetna challenge the finding that the plaintiff would have been compensated for the work if the contract had been completed by EI. On the basis of these findings, the cost of $11,060 for unbilled labor and materials comes within the purview of § 49-42. We affirm the trial court's decision on this claim.

# D

## Extra Costs of Subsurface Conditions

The plaintiff claims in its cross appeal under count eight that it is entitled to recover from Aetna extra costs for additional work required because of the subsurface conditions at the project site. The plaintiff claims that, contrary to indications in the contract, the cofferdam site contained numerous clustered boulders and cobbles, and that the plaintiff could not proceed with its work under the subcontract until it had removed these objects. This claim is foreclosed by the trial court's findings.

The trial court found, "based on testimony of various expert witnesses, and on testimony of [the plaintiff's president] himself, that at the time of signing the subcontract, he was aware, or should have been aware, based on all available data, including his own investigation, that the site contained 'glacial till' soils that characteristically contain cobbles and boulders of varying amounts and sizes, and that for anyone to rule out the presence of cobbles and boulders of the kind actually encountered would be unreasonable, even if *some* test borings did not turn up any cobbles or boulders, or ones that were smaller than found in the cofferdam site. The plaintiff should have anticipated and made allowance for this presence, based on the *totality* of information available." (Emphasis in original.) The trial court determined that the claimed extra work costs were not truly extra because they were not beyond the scope of the subcontract. The trial court's findings are not clearly erroneous; *Groton* v. *Yankee Gas Services Co.*, supra, 224 Conn. 691; and we therefore hold that the trial court correctly denied the plaintiff recovery against Aetna on this claim.[27]

---

[27] Although the trial court made these findings, we note that the trial court awarded damages of $111,381 for the extra costs against EI. See footnote 5. EI has not appealed from this portion of the judgment.

## II

### COMPENSATORY INTEREST PURSUANT TO GENERAL STATUTES § 37-3a

Aetna also appeals with respect to the counts on which an award for compensatory interest was made and the plaintiff cross appeals with respect to the counts on which no such interest was awarded. The trial court awarded the plaintiff compensatory interest pursuant to General Statutes (Rev. to 1983) § 37-3a[28] as follows:

| | |
|---|---|
| Count one—Progress Payments | $109,404.93 |
| Count two—Equipment Rentals & Standby Labor | - 0 - |
| Count three—Steel Rental & Liquidation | - 0 - |
| Count four—Retainage | 10,735.41 |
| Count five—Extra Work | 11,740.73 |
| Count six—Electricity | 2,354.32 |
| Count seven—Cost Not Billed & Earned Profit | - 0 - |
| Count nine—Increased Labor Costs | 2,601.80 |
| Total | $136,837.19 |

We begin our analysis with the appropriate standard of review with respect to the award of compensatory interest. "The allowance of prejudgment interest as an element of damages is an equitable determination and a matter lying within the discretion of the trial court. . . . Before awarding interest, the trial court must ascertain whether the defendant has wrongfully detained money damages due the plaintiff. . . . Interest on such damages ordinarily begins to run from the time it is due and payable to the plaintiff. . . . The determination

---

[28] General Statutes (Rev. to 1983) § 37-3a provides in relevant part: "Except as provided in sections 37-3b and 52-192a, interest at the rate of eight per cent a year, and no more, may be recovered and allowed in civil actions or arbitration proceedings under chapter 909, including actions to recover money loaned at a greater rate, as damages for the detention of money after it becomes payable . . . ."

of whether or not interest is to be recognized as a proper element of damage, is one to be made in view of the demands of justice rather than through the application of an arbitrary rule." (Citations omitted; internal quotation marks omitted.) *West Haven Sound Development Corp.* v. *West Haven,* 207 Conn. 308, 321, 541 A.2d 858 (1988).

A trial court must make two determinations when awarding compensatory interest under § 37-3a: (1) whether the party against whom interest is sought has wrongfully detained money due the other party; and (2) the date upon which the wrongful detention began in order to determine the time from which interest should be calculated. *Metcalfe* v. *Talarski,* 213 Conn. 145, 160, 567 A.2d 1148 (1989); *West Haven Sound Development Corp.* v. *West Haven,* supra, 207 Conn. 321.

## A

Aetna does not challenge the trial court's broad discretion in determining whether the money due the plaintiff was wrongfully detained. Rather, its claim is with respect to the date the interest calculation should commence. Although the plaintiff first put Aetna on written notice of EI's default on October 5, 1984, the record is unclear as to when Aetna had actual notice of EI's default. The trial court calculated the interest awarded against Aetna using the same date or dates that it used in awarding interest against EI.

Aetna focuses on two claims with respect to the date on which the interest calculation should begin. First, it argues that § 49-42 affords Aetna ninety days after service of the notice of claim to make payment on the bond or to assert a defense. This claim is predicated on an amendment to § 49-42 that did not become effective until 1987,[29] and that is therefore not applicable to

[29] The 1987 amendment added the following language relied upon by Aetna: "Within ninety days after service of the notice of claim, the surety shall

this case. See *American Masons' Supply Co.* v. *F. W. Brown Co.*, supra, 174 Conn. 222–25. Accordingly, we reject this argument.

Second, Aetna argues that interest should not have commenced until such time, at the very least, that demand was made upon it by the plaintiff, and that the earliest that could have occurred was on October 5, 1984. "Interest on the principal amount found due under a penal bond is allowable, but only from the time when the fact that such amount is due is brought definitely to the surety's knowledge." *Krall Coal Co.* v. *Century Indemnity Co.*, 139 Conn. 634, 641, 96 A.2d 311 (1953) (holding that interest should commence at least from institution of action on payment bond).

We are unable to determine from the trial court's memorandum of decision or from the record the basis of the trial court's decision for commencing interest on the date or dates that it did. Indeed, the trial court did not set forth the specific dates it commenced interest against Aetna. We are only able to determine that the trial court awarded interest against Aetna commencing on the same date it awarded interest against EI by comparing the interest allowed under each claim.[30] Aetna, as the appellant, bore the responsibility of providing an adequate record for review. *Matza* v. *Matza,*

make payment under the bond and satisfy the claim, or any portion of the claim which is not subject to a good faith dispute, and shall serve a notice on the claimant denying liability for any unpaid portion of the claim." Public Acts 1987, No. 87-345, § 2.

[30] Furthermore, with respect to interest awarded against EI on the progress payments that represented approximately $110,000 of the $137,000 interest allowed, the trial court does not set forth specific dates on which it commenced its interest calculation. Because we know the rate of interest applied, the amount of interest and the termination date to which interest was calculated, we could, of course, mathematically determine the date on which it was commenced. Even if we were willing to make these calculations, it would not resolve the basic flaw in the record—that is, the absence of the trial court's reasoning as to why it commenced the interest calculations when it did.

226 Conn. 166, 187, 627 A.2d 414 (1993). Aetna, however, argues that it sought an articulation from the trial court on this issue, which the trial court did not address.[31] When a trial court fails to answer a motion for articulation or does so incompletely, the appellant should seek a further articulation. See *Montanaro Bros. Builders, Inc.* v. *Snow*, 4 Conn. App. 46, 51, 492 A.2d 223 (1985). Indeed, we have held that "where a party is dissatisfied with the trial court's response to a motion for articulation, he may, and . . . under appropriate circumstances he must, seek immediate appeal of the rectification memorandum to this court via the motion for review. Practice Book §§ [4051, 4050] . . . ." (Internal quotation marks omitted.) *Highgate Condominium Assn.* v. *Watertown Fire District*, 210 Conn. 6, 21, 553 A.2d 1126 (1989).[32] Aetna failed to seek this review. Accordingly, we decline to address this issue raised by Aetna.

## B

The plaintiff in its cross appeal seeks compensatory interest for those counts under which the trial court awarded only damages. The trial court did not award compensatory interest on count two for equipment rentals and standby labor "because the amount claimed was greatly reduced just before trial," on count three for steel rental and liquidation "because [of serious] substantial legal questions . . . as to how damages should be determined"; or on count seven for earned

---

[31] Aetna's motion for articulation included a number of issues. Although the trial court did not address the issue of when interest against Aetna commenced, it did make supplemental findings to respond to other portions of the motion.

[32] The need for further articulation is particularly strong in the present case. As Aetna recognized in its motion for articulation, "this complex case presents the trial court with an uncountable number of issues for consideration." It was tried to the court over a three month period, during which more than 220 items were either marked for identification or entered as exhibits.

profit and unbilled costs because the amount claimed by the plaintiff was "not properly quantified until just before trial."

We reject the plaintiff's claim for interest on these counts because we conclude that the trial court did not abuse its discretion. As we previously indicated, "[t]he allowance of interest as an element of damages is primarily an equitable determination and a matter within the discretion of the trial court." *Nor'easter Group, Inc.* v. *Colossale Concrete, Inc.*, supra, 207 Conn. 482. There is sufficient evidence in the record to support the trial court's findings and conclusions.

## III

## OFFER OF JUDGMENT ISSUES

Aetna argues that the trial court improperly awarded offer of judgment interest under General Statutes (Rev. to 1983) § 52-192a.[33] Specifically, we restate Aetna's claims: (1) the plaintiff improperly directed a unified

[33] General Statutes (Rev. to 1983) § 52-192a provides: "(a) After commencement of any civil action based upon contract or for the recovery of money only, the plaintiff may before trial file with the clerk of the court a written 'offer of judgment' signed by him or his attorney, directed to the defendant or his attorney, offering to settle the claim underlying the action and to stipulate to a judgment for a sum certain. The plaintiff shall give notice of the offer of settlement to the defendant's attorney, or if the defendant is not represented by an attorney, to the defendant himself. Within thirty days after being notified of the filing of the 'offer of judgment,' the defendant or his attorney may file with the clerk of the court a written 'acceptance of offer of judgment' agreeing to a stipulation for judgment as contained in plaintiff's 'offer of judgment.' Upon such filing, the clerk shall enter judgment immediately on the stipulation. If the 'offer of judgment' is not accepted within thirty days, the 'offer of judgment' shall be considered rejected and not subject to acceptance unless refiled. Any such 'offer of judgment' and any 'acceptance of offer of judgment' shall be included by the clerk in the record of the case.

"(b) After trial the court shall examine the record to determine whether the plaintiff made an 'offer of judgment' which the defendant failed to accept. If the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain stated in his 'offer of judgment,' the court shall add to the verdict twelve per cent annual interest

offer of judgment to multiple defendants; (2) the offer of judgment was invalidated when the plaintiff amended its complaint to add a claim not contemplated in the offer of judgment; (3) the trial court improperly refused to abate interest for the period during which the state court proceedings were informally stayed; and (4) the offer of judgment statutes, §§ 52-192a and 52-193 through 52-195,[34] treat plaintiffs and defendants so differently as to violate the equal protection and due process guarantees of the federal and state constitutions. We disagree with each of these claims.

on the amount of the verdict, computed from the date such offer was filed in actions commenced before October 1, 1981. In those actions commenced on or after October 1, 1981, the interest shall be computed from the date the complaint in the civil action was filed with the court if the 'offer of judgment' was filed not later than eighteen months from the filing of such complaint. If such offer was filed later than eighteen months from the date of filing of the complaint, the interest shall be computed from the date the 'offer of judgment' was filed. The court may award reasonable attorney's fees in an amount not to exceed three hundred fifty dollars, and shall render judgment accordingly. This section shall not be interpreted to abrogate the contractual rights of any party concerning the recovery of attorney's fees in accordance with the provisions of any written contract between the parties to the action."

[34] General Statutes (Rev. to 1983) § 52-193 provides: "In any action on contract, or for the recovery of money only, the defendant may before trial file with the clerk of the court a written notice signed by him or his attorney, directed to the plaintiff or his attorney, offering to allow the plaintiff to take judgment for the sum named in such notice."

General Statutes § 52-194 provides: "In any action, the plaintiff may, within ten days after being notified by the defendant of the filing of an offer of judgment, file with the clerk of the court a written acceptance of the offer signed by himself or his attorney. Upon the filing of the written acceptance, the court shall render judgment against the defendant as upon default for the sum so named and for the costs accrued at the time of the defendant's giving the plaintiff notice of the offer. No trial may be postponed because the period within which the plaintiff may accept the offer has not expired, except at the discretion of the court."

General Statutes § 52-195 provides: "(a) If the plaintiff does not, within the time allowed for acceptance of the offer of judgment and before the commencement of the trial, file his notice of acceptance, the offer shall be deemed to be withdrawn and shall not be given in evidence.

"(b) Unless the plaintiff recovers more than the sum named in the offer of judgment, with interest from its date, he shall recover no costs accruing

The trial court determined that the plaintiff was entitled to a judgment against Aetna in the amount of $434,154.88, which included compensatory interest in the amount of $136,837.19 pursuant to § 37-3a.[35] After trial and upon determining the damages to which the plaintiff was entitled from each defendant, the trial court examined the file pursuant to § 52-192a and ascertained that the plaintiff filed the original complaint on November 30, 1984, and then filed a single offer of judgment on December 18, 1984, directed at the three defendants, EI, Aetna and Waterbury, in the amount of $300,000. In other words, the plaintiff offered to settle all its claims against these defendants for a total of $300,000. None of the defendants accepted the offer of judgment. The trial court then assessed offer of judgment interest pursuant to § 52-192a against Aetna in the amount of 12 percent from the date the complaint was filed, which totaled $533,183.28 and included attorney's fees of $350.[36]

A

We first address whether § 52-192a permits a plaintiff to direct a unified offer of judgment to multiple defend-

after he received notice of the filing of such offer, but shall pay the defendant's costs accruing after he received notice. Such costs may include reasonable attorney's fees in an amount not to exceed three hundred fifty dollars.

"(c) This section shall not be interpreted to abrogate the contractual rights of any party concerning the recovery of attorney's fees in accordance with the provisions of any written contract between the parties to the action. The provisions of this section shall not apply to cases in which nominal damages have been assessed upon a hearing after a default or after a demurrer has been overruled."

[35] The offer of judgment is to be compared to the amount that the plaintiff "has recovered," which includes compensatory interest. *Gillis* v. *Gillis*, 21 Conn. App. 549, 556, 575 A.2d 230, cert. denied, 215 Conn. 815, 576 A.2d 544 (1990) (concluding that trial court improperly denied offer of judgment interest on § 37-3a interest portion of verdict); see also *Gionfriddo* v. *Avis Rent A Car System, Inc.*, 192 Conn. 301, 304–305, 472 A.2d 316 (1984) ("it is the total judgment that is the relevant [basis] for comparison").

[36] The trial court likewise awarded the plaintiff offer of judgment interest against EI in the amount of $830,377.15, including attorney's fees of $350. See footnote 5.

ants. That statute provides in relevant part that "the plaintiff may before trial file with the clerk of the court a written 'offer of judgment' signed by him or his attorney, directed to the defendant or his attorney, offering to settle the claim underlying the action and to stipulate to a judgment for a sum certain." General Statutes (Rev. to 1983) § 52-192a (a). If the defendant fails to accept the plaintiff's offer of judgment, subsection (b) of that statute requires the court to add 12 percent annual interest on the amount of the damages and reasonable attorney's fees in an amount not to exceed $350 when "the plaintiff has recovered an amount equal to or greater than the sum certain stated in his 'offer of judgment.' "

Aetna argues that the plain language of § 52-192a requires a plaintiff to file individual offers of judgment when there are multiple defendants. It further claims that this construction is necessary in order to fulfill the statute's objective of promoting settlements. We reject these claims.

"In interpreting the meaning of a statute, we attempt to determine the intent of the legislature as expressed by the common and approved usage of the words in the statute. . . . General Statutes § 1-1 (f) provides that [w]ords importing the singular number may extend and be applied to several persons or things and words importing the plural may include the singular. . . . In the interpretation of statutory provisions, the application of common sense to the language is not to be excluded." (Citations omitted; internal quotation marks omitted.) *Nationwide Ins. Co.* v. *Gode*, 187 Conn. 386, 393–94, 446 A.2d 1059 (1982), overruled in part, *Covenant Ins. Co.* v. *Coon*, 220 Conn. 30, 36 n.6, 594 A.2d 977 (1991). Indeed, the fundamental "objective of statutory construction is to give effect to the intended purpose of the legislature." *Gifford* v. *Freedom of Information Commission*, 227 Conn. 641, 652, 631 A.2d 252 (1993).

In construing § 52-192a, we first note that its purpose is to encourage pretrial settlements and, consequently, to conserve judicial resources. *Gionfriddo* v. *Avis Rent A Car System, Inc.*, 192 Conn. 301, 305, 472 A.2d 316 (1984); *Verrastro* v. *Sivertsen*, 188 Conn. 213, 223–24, 448 A.2d 1344 (1982); *Lutynski* v. *B. B. & J. Trucking, Inc.*, 31 Conn. App. 806, 811, 628 A.2d 1 (1993), aff'd, 229 Conn. 525, 642 A.2d 7 (1994). "[T]he strong public policy favoring the pretrial resolution of disputes . . . is substantially furthered by encouraging defendants to accept reasonable offers of judgment." (Citation omitted.) *Black* v. *Goodwin, Loomis & Britton, Inc.*, 239 Conn. 144, 165, 681 A.2d 293 (1996). Section 52-192a encourages fair and reasonable compromise between litigants by penalizing a party that fails to accept a reasonable offer of settlement. *Edward Denike Tree Co.* v. *Butler*, 21 Conn. App. 366, 369, 573 A.2d 349 (1990). In other words, interest awarded under § 52-192a "is solely related to a defendant's rejection of an advantageous offer to settle before trial and his subsequent waste of judicial resources." *Paine Webber Jackson & Curtis, Inc.* v. *Winters*, 22 Conn. App. 640, 654, 579 A.2d 545, cert. denied, 216 Conn. 820, 581 A.2d 1055 (1990).[37] Of course, the partial settlement of a case does little for the conservation of our limited judicial

---

[37] The purpose of offer of judgment interest was clearly stated in the legislative debate: "[T]his Bill addresses a real problem in Connecticut. At the present time we have about a six year delay in civil jury cases in our larger cities, which means if you are a litigant, it will take you six years before your case is heard in a court and this is really a disgraceful situation and the Judiciary Committee has recognized its obligation to try and improve this situation. One major reason for this delay is that one party frequently has an economic incentive or an economic interest to continue the delay, to hold on to the money and not to settle the case since it can invest the proceeds and keep them at a high rate of interest within its own control. . . . So the intent of this Bill is to provide an incentive for both parties to bargain reasonably and in good faith and to settle close cases, rather than delaying the process for themselves and all the many litigants behind them." 22 H.R. Proc., Pt. 5, 1979 Sess., pp. 1682–83, remarks of Representative John A. Berman.

resources. Accordingly, the ultimate goal in a multi-party lawsuit is the fair and reasonable settlement of the case on a global basis.

We find that, in light of the purpose of § 52-192a of encouraging pretrial settlements, and applying common sense to the language of § 52-192a, the term "defendant" reasonably and logically should be interpreted to include the plural term "defendants." In our view, it is within the plaintiff's discretion whether to file a unified offer of judgment against multiple defendants or to file a separate offer of judgment against each defendant. If the plaintiff files a unified offer of judgment that is not accepted, each defendant will be subject to offer of judgment interest only if the ultimate judgment rendered against *that particular defendant* equals or exceeds the amount of the offer.[38] See *Bower* v. *D'Onfro*, 38 Conn. App. 685, 703, 663 A.2d 1061, cert. denied, 235 Conn. 911, 665 A.2d 606 (1995) (holding trial court improperly equitably apportioned offer of judgment between defendants to determine offer of judgment interest liability). This construction of § 52-192a provides flexibility and effectuates the statute's purpose of promoting settlements. Moreover, this approach

"It's thought . . . that this type of legislation would hopefully . . . unclog the congested docket that we do have in the State of Connecticut." 22 S. Proc., Pt. 3, 1979 Sess., p. 944, remarks of Senator Alfred Santaniello.

[38] For example, assume that a plaintiff directs a unified offer of judgment in the amount of $50,000 to defendants A and B. A and B can then pool their resources to satisfy the aggregate demand and, therefore, settle the action. Alternatively, either A or B can unilaterally accept the offer of judgment and terminate the action. In either event, if the offer of judgment is satisfied, by A and B collectively or by A or B unilaterally, the case would be terminated as against both defendants. If, however, neither A nor B accepts the offer of judgment, then A or B will be subject to offer of judgment interest only if the damages found against *each* defendant equals or exceeds $50,000. In other words, if the damages found against A are $60,000, while those against B total $40,000, then only A will be subject to offer of judgment interest. Finally, if both defendants are found liable and there is joint and several liability of $50,000 total, then the defendants will also be jointly and severally liable for offer of judgment interest.

results in no prejudice to defendants—at all times each defendant has the ability to ascertain his or her exposure in light of the amount stated in the unified offer of judgment.[39] Indeed, we emphasize that a defendant cannot be liable for offer of judgment interest based on a judgment less than the amount in the unified offer. Each defendant, therefore, stands in exactly the same position as if the offer of judgment were directed to that individual defendant, except that a unified offer of judgment may facilitate coordinated action and global settlement.[40]

The enhancement of global settlement by permitting unified offers to multiple defendants is demonstrated

[39] We also find unpersuasive Aetna's argument that the requirement of § 52-192a that the plaintiff state a "sum certain" precludes a unified offer of judgment to multiple defendants. Section 52-192a (a) only requires that the plaintiff offer "to stipulate to a judgment for a sum certain." Therefore, the relevant question is whether, on the face of the offer of judgment, the plaintiff has set forth a specific amount as a settlement offer.

[40] The dissent and Aetna rely on cases from other jurisdictions that prohibit plaintiffs from making unified offers of judgment to multiple defendants. These jurisdictions conclude that the assessment of offer of judgment interest on the aggregate amount recovered from the defendants would prejudice each defendant because the individual defendants cannot adequately assess their risks prospectively. In other words, these jurisdictions find that unified offers prejudice each defendant based on the premise that liability for offer of judgment interest is determined by comparing the sum of the amounts recovered from the defendants to the amount of the unified offer. See, e.g., *Taylor* v. *Clark*, 883 P.2d 569, 571 (Colo. App. 1994) ("[S]ince an unapportioned offer can only be accepted by all the offerees acting in unison, an individual offeree cannot independently weigh the benefit of accepting an unspecified portion of the offer against the likelihood of receiving a less favorable judgment. Thus, an unapportioned offer to multiple parties takes away the individual offeree's ability to make a meaningful choice between accepting the offer or continuing with the litigation, and application of the statute under these circumstances does not comport with the policy of encouraging the settlement of lawsuits."); *Yada* v. *Simpson*, Nev. , 913 P.2d 1261, 1263 (1996) ("[s]uch an offer of judgment does not serve to encourage settlement since the individual defendants are unable to determine their share of a joint offer and make a meaningful choice between accepting the offer or continuing to litigate"); *Wilber* v. *Fuchs*, 158 Wis. 2d 158, 164, 461 N.W.2d 803 (Wis. App. 1990) (concluding unified offer of judgment "did not permit each defendant to individually evaluate the offer

by hypothesizing additional facts in this case. If unified offers were not permitted, the plaintiff in this case just as easily could have submitted separate offers of judgment in the amount of $300,000 to each defendant, instead of the single offer of $300,000 to all the defendants, and Aetna would have been in the same position that it now finds itself. In that case, if only one defendant had accepted the offer of judgment, the case would have been settled for that one defendant, but would have remained pending as to the other defendants. Under those circumstances, there would be little incen-

from the perspective of that defendant's assessment of his or her own exposure"). We agree that allowing offer of judgment interest when the collective amount recovered against the defendants equals or exceeds the unified offer of judgment would unfairly prejudice the defendants.

Under our approach, however, defendants suffer no prejudice because they *can adequately assess* their own exposure in comparison to the amount of the unified offer. Our rule provides for offer of judgment interest by comparing the damages recovered from *each* defendant to the amount of the unified offer of judgment. In other words, a defendant will only be liable for offer of judgment interest when the amount of damages recovered against that particular defendant equals or exceeds the amount of the unified offer. See footnote 38. Indeed, if the cases on which the dissent relies were to use our approach, then unified offers of judgment would likely pass muster in those jurisdictions because it does not prejudice the individual defendant. See *Wilber* v. *Fuchs*, supra, 158 Wis. 2d 164 ("[Our cases] do not condemn offers of settlement that can 'force' settlements. Rather, they condemn offers of settlement that *unreasonably* force settlements. . . . Thus, a plaintiff's offer of settlement may properly be said to 'force' a settlement when the defendant's motivation to settle results from an opportunity to fairly assess the offer in light of the *particular* claim made against that defendant." [Citation omitted; emphasis in original.]); see also *Taing* v. *Johnson Scaffolding Co.*, 9 Cal. App. 4th 579, 584, 11 Cal. Rptr. 2d 820 (1992) ("Assume a joint settlement offer of $300,000 to three defendants by a single plaintiff. Defendants A and B want to accept and suggest that each defendant pay $100,000, but defendant C refuses. The case is tried, plaintiff receives $600,000 in economic damages and defendants are found equally liable [$200,000 against each]. In addition to their responsibility for the judgment, defendants A and B are now subject to [offer of settlement] penalties along with C, although it was their desire to accept the plaintiff's offer of settlement. *On the other hand, can defendants argue that since plaintiff did not obtain a $300,000 verdict against any one of them, they beat plaintiff's offer?*" [Emphasis added.]).

tive for the plaintiff to withdraw the case with respect to the remaining defendants without further compensation. On the other hand, the acceptance of the unified offer of judgment of $300,000 by any one defendant, with or without contribution from the remaining defendants, would have resulted in the global settlement of the case and complete removal from the judicial process.[41]

In reaching our conclusion, we are mindful of this court's prior admonition that "[t]he policy of encouraging settlements counsels against piecemeal offers of judgment." *Gionfriddo* v. *Avis Rent A Car System, Inc.*, supra, 192 Conn. 307. There are many instances in which it would be imprudent for a plaintiff to file individual offers of judgment to multiple defendants because partial settlement may inadvertently extinguish rights against nonsettling defendants by operation of law. Annot., 92 A.L.R.2d 533 (1963). A plaintiff, as a practical matter, would not file separate offers of judgment in cases involving vicarious liability based on respondeat superior, automobile owner/operator negligence, or statutory indemnification claims unless each of those offers of judgment were for the full value of the case.[42] Accordingly, in cases in which global settlement is the only viable alternative, permitting unified offers of judgment promotes the purpose of § 52-192a of encouraging settlements.[43]

---

[41] If Aetna had unilaterally accepted the unified offer of judgment, it could have then sought indemnification from its principal, EI, if any such claim were viable. See 74 Am. Jur. 2d, Suretyship § 171 (1974).

[42] See, e.g., General Statutes § 7-465 (requiring indemnification of employees by municipalities); *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 500–501, 656 A.2d 1009 (1995) (setting forth standard for employer liability for intentional torts of employees acting within scope of employment); *Graham* v. *Wilkins*, 145 Conn. 34, 41, 138 A.2d 705 (1958) (noting automobile rental statute establishes vicarious liability of owner for operator's negligence).

[43] There are, of course, practical reasons why a plaintiff may not wish to present to two jointly and severally liable defendants separate offers of

Indeed, the Connecticut Defense Lawyers Association, which filed an amicus brief in support of Aetna's position on unified offers of judgment, recognized that exceptions could be carved out of a rule prohibiting unified offers in appropriate cases, "where the relationship among plaintiffs or among defendants is so strong that they should not be considered 'multiple parties,' but instead a single party, for purposes of the offer of judgment procedure." This approach, which would require exceptions to be determined on a case-by-case basis, would cause unnecessary confusion among litigants and would be counterproductive to the promotion of pretrial settlement. Such confusion is demonstrated by the numerous conflicting trial court opinions on this very issue.[44] We do not believe that the legislature intended such a result.

Nevertheless, we recognize that there are situations in which the settlement process will be enhanced by the plaintiff's making separate offers of judgment in a multiple defendant case. Plaintiffs, however, must make this evaluation on a case-by-case basis, just as they do in determining the amount of the offer. We recognize that a plaintiff, in the first instance, is not required to

judgment for one half of the amount for which the plaintiff seeks a settlement. For example, either of the defendants may be insolvent or there may be other practical trial reasons from the plaintiff's perspective that counsel against piecemeal settlement.

[44] Compare, e.g., *Costantini* v. *Redniss*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV930132769S (May 26, 1995) (finding § 52-192a permits plaintiff to file unified offer of judgment to multiple defendants), and *Papay* v. *Nissan*, Superior Court, judicial district of New Haven at Meriden, Docket No. CV93-0242641S (December 19, 1994) (concluding plaintiff, in his or her discretion, may direct separate offers or one unified offer of judgment to multiple defendants), with *Nettleton* v. *Arno*, Superior Court, judicial district of Litchfield, Docket No. CV940064655 (April 23, 1996) (concluding offer of judgment interest does not apply to unified offer of judgment filed by two unrelated plaintiffs), and *Conte* v. *Escobar*, Superior Court, judicial district of Fairfield, Docket No. CV920290540S (January 13, 1995) (finding that § 52-192a requires plaintiff to file separate offers of judgment for each defendant).

file an offer of judgment. We assume that if a plaintiff makes an offer of judgment, the plaintiff does so in order to encourage the settlement of the case and not as an exercise in futility.[45] Allowing the plaintiff the flexibility to determine whether to submit a unified offer or individual offers will further the overriding purpose of § 52-192a of promoting pretrial settlements.

Our interpretation of § 52-192a does not necessarily give plaintiffs full control of the statutory mechanism for settlement of cases. In order to induce settlements, the legislature has also afforded defendants the opportunity to direct an offer of judgment to the plaintiff. See General Statutes (Rev. to 1983) § 52-193.[46] If the plaintiff refuses the defendant's offer of judgment and the plaintiff ultimately recovers less than that amount at trial, then the plaintiff's recovery of costs is limited, and the plaintiff would be liable for all the defendant's costs accruing after the date of notice, including attorney's fees not to exceed $350. General Statutes § 52-195 (b).[47] Although we recognize that the defendant's sword may not have the same cutting edge that offer of judgment interest has,[48] it is the defendant who holds

---

[45] As a practical consideration, in a case in which multiple defendants are not jointly and severally liable, it may be imprudent for a plaintiff to submit a unified offer of judgment because of the unlikelihood that it would produce a pretrial settlement. This court pointed this out in dicta in *Civiello* v. *Owens-Corning Fiberglass Corp.*, 208 Conn. 82, 92, 544 A.2d 158 (1988): "[W]here there are multiple defendants, [not] one of them would ordinarily be inclined to accept an offer of judgment for a sum approaching the full amount of damages likely to be awarded to a plaintiff, unless the likelihood of his being held solely liable were extreme." Moreover, in such circumstances, the judgments against the individual defendants would not likely be equal to or exceed the unified offer of judgment, thus obviating an award of offer of judgment interest.

[46] See footnote 34.

[47] See footnote 34.

[48] Nevertheless, in some cases, costs can be significant. See, e.g., General Statutes § 52-260 (f) (providing certain expert witness fees may be taxable as costs).

the key to the settlement process when a reasonable offer is made by the plaintiff.

We conclude that, when making an offer of judgment under § 52-192a, it is within the plaintiff's discretion whether to file a unified offer of judgment for multiple defendants or separate offers of judgment for each defendant. Our reasoning today applies equally to unified offers of judgment made by multiple plaintiffs.[49] Accordingly, we find that the plaintiff's unified offer directed to these defendants was properly made under § 52-192a.

## B

Aetna also argues that the offer of judgment was invalidated because the plaintiff added a claim against Aetna that was not contemplated in the offer of judgment. We disagree.

Throughout the litigation, the plaintiff asserted nine claims against Aetna and EI. In September, 1992, the plaintiff amended count three, claiming liquidation costs instead of continued rental costs for its steel, based on Waterbury's confiscation of the steel pursuant to its contract with EI. See part I C 3 of this opinion. Although the plaintiff had changed the basis of its damage calculations from solely rental to both rental and

[49] Although the issue of unified offers of judgment made by multiple plaintiffs is not present in this case, we recognize that there is substantial confusion among members of the bar and, therefore, we requested that the parties and amici curiae submit additional briefs on the issue. See footnote 10.

We note that the same approach that we have set forth today regarding a plaintiff's unified offer of judgment to multiple defendants; see footnote 38; would apply in those instances in which multiple plaintiffs file a unified offer of judgment to one or more defendants. Each defendant would be liable for offer of judgment interest only if the recovery of the plaintiffs seeking the interest from that defendant exceeds the amount of the unified offer. Thus, each defendant to whom the unified offer of judgment applies must assess prospectively his or her exposure to each plaintiff compared to the aggregate amount demanded.

liquidation values under count three,[50] the trial court found that the offer of judgment remained effective.

In resolving this issue, we find persuasive the reasoning of the Appellate Court in *Lutynski* v. *B. B. & J. Trucking, Inc.*, supra, 31 Conn. App. 806. In *Lutynski*, the plaintiff sought damages for the defendant's negligent operation of a motor vehicle. Id., 809. The plaintiff originally alleged that he had been " 'thrown about the interior of the car striking his face and head against the windshield, which shattered, and he was trapped in his car as it was crushed around him.' " Id. After the offer of judgment was filed, the plaintiff amended his complaint to allege damages based upon " 'permanent brain damage with an emotional upset.' " Id., 809–10. On the eve of trial, the plaintiff again amended his complaint by alleging " 'an increased risk of future harm' " and fear regarding further head injury. Id., 810.

Holding that the amendments to the complaint did not invalidate the offer of judgment, the *Lutynski* court stated: "An offer of judgment is an offer to settle the entire case, including claims both known and unknown, and both certain and uncertain. *Gionfriddo* v. *Avis Rent A Car System, Inc.*, supra, [192 Conn.] 307. Obviously, if injuries worsen as time passes, damages will increase, and, if injuries mend, damages will decrease. These are the vagaries of offers of settlement. The fact that the plaintiff amended his complaint to allege 'permanent brain damage with an emotional upset' does not make his claim for damages less of a claim underlying his action. There is only one claim underlying the plaintiff's action, although its value may change. We conclude that the plaintiff made an offer to settle that claim, including present and future damages arising from injuries known and unknown as of that date." *Lutynski* v. *B. B. & J. Trucking, Inc.*, supra, 31 Conn. App. 813–14.

---

[50] See part I C 3 of this opinion.

Applying the reasoning of *Lutynski* to the present case, we conclude that the amendment to the plaintiff's complaint did not invalidate the offer of judgment. Here, the plaintiff sought to recover damages for the labor and material it expended on the construction of the plant, including ongoing costs under the subcontract for the rental of the steel. When the steel was not returned, the plaintiff amended the complaint seeking to recover its full cost as measured by the steel's liquidation value. Contrary to Aetna's contention, the underlying claim is not based on the method of compensation sought for the steel, but, rather, on the breach of the subcontract. When the offer of judgment was made on December 18, 1984, Aetna had the opportunity to conclude the entire matter for $300,000. It chose not to do so. Accordingly, we conclude that the plaintiff's amendment seeking liquidation costs for the steel under count three did not invalidate the offer of judgment.[51]

C

Aetna next argues that the trial court improperly refused to toll the offer of judgment interest for the three year period that the state court proceedings were informally stayed. We disagree.[52]

[51] Aetna also claims that, given the fact that the plaintiff made a unified offer of judgment, the plaintiff waived its right to claim offer of judgment interest because of the concession it made during trial that Waterbury was secondarily liable. For the same reasons we do not invalidate the offer of judgment because the plaintiff amended its complaint with respect to the steel, we also conclude that the plaintiff's concession that Waterbury was secondarily liable at trial did not invalidate the offer. Simply put, the uncertainties of litigation is a factor that a defendant must take into account when deciding whether to accept or reject an offer of judgment.

[52] We agree with Aetna, however, that this issue should not be decided on the basis of the trial court's rationale. The trial court declined to reduce the offer of judgment interest during the period of the informal stay on the following basis: "The official court docket sheet shows no orders concerning a stay. It does show that the parties engaged in activities throughout the ten years of litigation except during the period from December 23, 1988, to December 5, 1991." Because Aetna offered no evidence proving the duration

Contemporaneously with the commencement of the plaintiff's action, EI instituted an action in federal court on November 19, 1984, claiming, inter alia, that Waterbury's termination of the contract was wrongful.[53] During the ongoing federal litigation, this action was held in abeyance pursuant to an agreement between the trial court, *Pickett, J.*, and the United States District Court, *Burns, J.* This agreement permitted discovery to proceed in the federal litigation prior to the trial court's taking action in this case. The plaintiff never formally agreed to stay the proceedings, but acknowledged that it made sense to try the federal case first.

The imposition of interest as a result of finding that the plaintiff was entitled to an award of damages in excess of the offer of judgment is mandatory. "Our courts have consistently held that prejudgment interest is to be awarded by the trial court when a valid offer of judgment is filed by the plaintiff, the offer is rejected by the defendant, and the plaintiff ultimately recovers an amount greater than the offer of judgment after trial. . . . *Moreover, an award of interest under § 52-192a is mandatory, and the application of § 52-192a does not depend on an analysis of the underlying circumstances of the case or a determination of the facts. . . .* The statute is admittedly punitive in nature. . . . It is the punitive aspect of the statute that effectuates the underlying purpose of the statute and provides the impetus to settle cases." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 812–13; *Paine Webber Jackson & Curtis, Inc.* v. *Winters,* supra, 22 Conn. App. 652; see *Gionfriddo* v. *Avis Rent A Car System, Inc.,* supra, 192 Conn. 307 (holding trial court must calculate offer of judgment interest on double or treble damages allowed under General Statutes § 14-

of the informal stay, the trial court refused to "speculate as to the length of the period of any 'stay.'"

[53] See footnote 22.

295); *Gillis* v. *Gillis*, 21 Conn. App. 549, 556, 575 A.2d 230, cert. denied, 215 Conn. 815, 576 A.2d 544 (1990) (concluding that trial court should have taken into account compensatory interest under § 37-3a in determining offer of judgment interest).

In the present case, Aetna invites this court to carve out an exception to the mandatory nature of § 52-192a by suspending offer of judgment interest during the period of the informal stay. If this court were to indulge Aetna's invitation, however, we would contravene the statute's purpose of encouraging prompt settlements. As the *Lutynski* court aptly stated, "[h]ad the defendant elected to accept the plaintiff's offer of judgment, it would have been insulated from liability for any future damages . . . ." *Lutynski* v. *B. B. & J. Trucking, Inc.*, supra, 31 Conn. App. 815. Similarly, in this case, if Aetna had accepted the offer of judgment, it would have been insulated from liability for interest during the period of the informal stay.[54] Aetna made a calculated decision not to accept the offer of judgment and it must, therefore, accept the "vagaries" of litigation. Id., 813. Therefore, under the express language of § 52-192a, we conclude that Aetna is not entitled to a credit for offer of judgment interest during the period of the informal stay.

### D

Aetna's final claim is that §§ 52-192a and 52-193 through 52-195 are unconstitutional under the equal protection and due process clauses of the federal and state constitutions. We disagree with each of these claims.

---

[54] The same reasoning applies to delays in litigation due to court congestion, which are not the fault of the parties. If we allowed a suspension for the stay, we would open the door for a defendant in another case to be insulated from liability for interest as a result of delay due to congested dockets. That, however, would defeat the entire purpose of § 52-192a.

"We recognize that a party challenging the constitutionality of a statute must prove its unconstitutionality beyond a reasonable doubt. . . . While the courts may declare a statute to be unconstitutional, our power to do this should be exercised with caution, and in no doubtful case. . . . Every presumption is to be given in favor of the constitutionality of the statute." (Citations omitted; internal quotation marks omitted.) *Fair Cadillac-Oldsmobile Isuzu Partnership* v. *Bailey*, 229 Conn. 312, 316, 640 A.2d 101 (1994).

Aetna argues that §§ 52-192a and 52-193 through 52-195 treat plaintiffs and defendants so differently as to violate the equal protection clauses of article first, §§ 1 and 20, of the Connecticut constitution[55] and the fourteenth amendment to the United States constitution. Specifically, Aetna points out that, under § 52-192a, a plaintiff who receives a judgment equal to or greater than its offer of judgment recovers 12 percent interest, plus costs and attorney's fees not exceeding $350, from the defendant. Conversely, if a plaintiff receives a judgment less than the defendant's offer of judgment, the plaintiff is limited to the costs he or she may recover, and must pay only the defendant's costs incurred after receipt of the offer and attorney's fees not exceeding $350. Therefore, Aetna argues, "a defendant will potentially suffer an enormous penalty for rejecting a plaintiff's offer of judgment, while a plaintiff's refusal to accept an offer of judgment is of comparatively little consequence." We are not persuaded.

[55] The constitution of Connecticut, article first, § 1, provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to public emoluments or privileges from the community."

The constitution of Connecticut, article first, § 20, as amended by article twenty-one of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

Our analysis commences with a determination of whether Aetna and other such defendants are similarly situated to those in the plaintiff's class. "To implicate the equal protection clauses under the state and federal constitutions . . . it is necessary that the state statute in question, either on its face or in practice, treat persons standing in the same relation to it differently." *Franklin* v. *Berger*, 211 Conn. 591, 596, 560 A.2d 444 (1989); see *Golab* v. *New Britain*, 205 Conn. 17, 25, 529 A.2d 1297 (1987) ("[e]qual protection of the laws prohibits the unequal treatment of those who are *similarly situated*" [emphasis in original]).

Inherent in any action for money damages is a plaintiff's claim that the defendant has harmed the plaintiff, and that the plaintiff's injury can be remedied by a monetary award. In other words, the plaintiff claims that the defendant holds money that rightfully belongs to the plaintiff. At all times during the lawsuit, it is the defendant, not the plaintiff, who holds the money in dispute and, therefore, has the incentive to prolong litigation. In our view, the allocation of offer of judgment interest against a defendant, who has had the opportunity to invest the money at issue during the proceedings, has no parallel to a plaintiff, who claims that he or she has been deprived of that money. Accordingly, under those circumstances, defendants and plaintiffs are not similarly situated and the equal protection clauses under both the state and the federal constitutions are not implicated.

Nevertheless, we will assume for the purposes of this case that, as a result of the award of compensatory interest as damages for money wrongfully withheld, the parties are similarly situated for equal protection purposes.[56] "When a statute is challenged on equal pro-

[56] In cases such as this, the award of compensatory interest may level the playing field. In other words, the plaintiff in this case is compensated for the loss of the use of the money to which it is entitled by being awarded

tection grounds, whether under the United States constitution or the Connecticut constitution, the reviewing court must first determine the standard by which the challenged statute's constitutional validity will be determined. If, in distinguishing between classes, the statute either intrudes on the exercise of a fundamental right or burdens a suspect class of persons, the court will apply a strict scrutiny standard wherein the state must demonstrate that the challenged statute is necessary to the achievement of a compelling state interest. . . . If the statute does not touch upon either a fundamental right or a suspect class, its classification need only be rationally related to some legitimate government purpose in order to withstand an equal protection challenge." (Internal quotation marks omitted.) *Benjamin* v. *Bailey*, 234 Conn. 455, 477, 662 A.2d 1226 (1995).

Because Aetna does not argue that the provisions of §§ 52-192a through 52-195 involve a fundamental right, or burden a suspect class, or warrant any other heightened review, we consider its claim under the rational basis standard. "Under the rational basis test, [t]he court's function . . . is to decide whether the purpose of the legislation is a legitimate one and whether the

---

compensatory interest. See part II of this opinion. Accordingly, it could be argued that the compensatory interest awarded to the plaintiff equalizes the position of the parties with respect to settlement of the case by providing the defendant with a disincentive to delay litigation.

Nevertheless, in negligence or other similar tort actions, the parties would not be similarly situated. In such cases, the plaintiff generally would not be entitled to compensatory interest prior to judgment. See *Foley* v. *Huntington Co.*, 42 Conn. App. 712, 739, 682 A.2d 1026, cert. denied, 239 Conn. 931, 683 A.2d 397 (1996) ("[§ 37-3a] does not allow prejudgment interest on claims that . . . do not involve the wrongful detention of money, such as personal injury claims"); see also *Brandewiede* v. *Emery Worldwide*, 890 F. Sup. 79, 82 (D. Conn. 1994) (stating that in determining whether to award compensatory interest, factor to be considered is whether sum recovered was for liquidated amount), aff'd, 66 F.3d 308 (2d Cir. 1995). In those situations, the defendant would have a strong incentive not to pay the money that may be due the plaintiff.

particular enactment is designed to accomplish that purpose in a fair and reasonable way." (Internal quotation marks omitted.) *Circuit-Wise, Inc.* v. *Commissioner of Revenue Services*, 215 Conn. 292, 300, 576 A.2d 1259 (1990). We recognize the legislature's broad discretion in its power to legislate, and that "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." (Internal quotation marks omitted.) *Broadley* v. *Board of Education*, 229 Conn. 1, 8–9, 639 A.2d 502 (1994). "In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification . . . ." (Citations omitted; internal quotation marks omitted.) *Johnson* v. *Meehan*, 225 Conn. 528, 536, 626 A.2d 244 (1993).

Contrary to Aetna's contention, we conclude that the legislature's decision to subject a defendant, and not a plaintiff, to offer of judgment interest is neither irrational nor arbitrary. As we have indicated, the primary purpose of the offer of judgment interest is to conserve judicial resources by promoting fair and reasonable settlements. The legislature reasonably could have concluded that this goal could be achieved by awarding offer of judgment interest to a plaintiff who submits a reasonable offer to settle that is rejected by the defendant. Indeed, it is the defendant who has the power to relieve itself from any liability for interest merely by accepting any reasonable offer to settle the case. The defendant is only liable for offer of judgment interest if it refuses to pay the reasonable value of the case as ultimately found by the trier of fact. Accordingly, the legislature's decision to mandate offer of judgment interest only against the defendant is rationally related

to the overall purpose of the offer of judgment statutes—to conserve judicial resources by promoting settlements.[57] "As long as the disparate treatment is, as here, rationally based, we may not judge the wisdom, desirability or logic of the legislative determination . . . ." (Citations omitted.) *Broadley* v. *Board of Education*, supra, 229 Conn. 9.

Aetna further argues that § 52-192a is fundamentally unfair, in violation of its constitutional right to due process. Specifically, Aetna contends that § 52-192a "fails to satisfy due process requirements because it is not rationally related to the legislature's goal of encouraging early, fair and reasonable settlement." We disagree.

We recently considered this precise claim in *Black* v. *Goodwin, Loomis & Britton, Inc.*, supra, 239 Conn. 166, in which we held: "Legislative efforts to structure and accommodate the burdens and benefits of economic life carry a presumption of constitutionality. One complaining of a due process violation flowing therefrom must establish that the legislature has acted in an

---

[57] Indeed, the legislative history of § 52-192a shows that this is precisely the reason that the legislature increased offer of judgment interest from 6 to 12 percent: "One of the reasons cases don't settle in our courts, and one of the reasons that cases are tried, where there are no real issues to try, is that when a reserve for a case is set aside by an insurance company, that reserve is invested, and insurance companies at that point get a return on that investment. . . . I would guess [the return on an investment] is somewhere between 10 and 11 percent. If an insurance company is basing a charge of 6 percent . . . it's to an insurance company's benefit not to settle a particular case. We feel that raising the interest rates to 12 percent would make the companies take a good hard look at any offer of judgment that was received and would provide the necessary backbone for the offer of judgment statute." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1979 Sess., p. 348, remarks of Richard Fuchs; see Conn. Joint Standing Committee Hearings, Judiciary, Pt. 5, 1981 Sess., p. 1470, remarks of Richard Beeder ("[t]he main reason that insurance companies don't settle cases now when they should settle them is because they make too much money investing the premiums").

arbitrary and irrational way. . . . Even under this less exacting test of constitutionality, an economic regulation will survive a substantive due process test only if it is both rational and related to a legitimate state purpose. . . . As we have indicated, § 52-192a furthers the legitimate public policy interest of encouraging the pretrial settlement of claims. Moreover, the legislature is not required to implement a public policy in a manner that is most narrowly tailored to achieve its end; its legislation will survive a substantive due process challenge so long as it is rationally related to a legitimate state purpose." (Citations omitted; internal quotation marks omitted.)[58]

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and NORCOTT, KATZ and PALMER, Js., concurred.

BORDEN, J., with whom MCDONALD, J., joins, dissenting in part. I agree with and join the majority opinion, except part III A thereof, in which the majority holds that General Statutes (Rev. to 1983) § 52-192a permits a plaintiff the choice of whether to submit either a unified offer of judgment or individual offers of judgment to multiple defendants. In my view, the better construction of this statute leads to the conclusion that the statute does not contemplate a unified offer of judgment to multiple defendants.[1] I therefore dissent from part III A of the majority opinion.

---

[58] In *Black* v. *Goodwin, Loomis & Britton, Inc.*, supra, 239 Conn. 144, we also rejected the claim that such an award of interest constitutes a penalty for the defendant exercising its right to a jury trial. We pointed out that "[t]his argument is without merit. The interest assessment is not levied on all who elect to go to trial in light of an offer of judgment, but only on those who subsequently suffer a jury verdict against them in excess of the amount set forth in the offer." Id., 165.

[1] Although this case does not present the issue, because the majority in dictum also states that multiple plaintiffs may submit one unified offer of judgment, I also dissent from that dictum, for much the same reasons that I offer in support of what I regard as a better construction of § 52-192a.

I begin with the language of the statute. It is obvious, from both the statutory language and its legislative history, that the legislature had in mind the paradigmatic case of one plaintiff and one defendant, and simply did not specifically address the situation, like this case, in which there is one plaintiff and more than one defendant. The language of the statute is cast in the singular; "*the plaintiff* may . . . file . . . a written 'offer of judgment' . . . directed to *the defendant*"; (emphasis added) General Statutes (Rev. to 1983) § 52-192a (a); as is the legislative history. "[T]he intent of this Bill is to provide an incentive for *both parties* . . . to settle close cases . . . ." (Emphasis added.) 22 H.R. Proc., Pt. 5, 1979 Sess., p. 1683, remarks of Representative John A. Berman.

I agree with the majority, however, that the language alone does not answer the question posed by this case, because General Statutes § 1-1 (f) states the common sense statutory notion that "[w]ords importing the singular number *may* extend and be applied to several persons or things . . . ." (Emphasis added.) The question, therefore, is how the statutory language in § 52-192a should be construed when it is applied to a factual situation that the legislature did not specifically contemplate.

I also agree with the majority that this question should be answered by construing the language in light of the purpose of the statute. In other words, given the purpose of the statute, *should* the singular language be construed to include the plural? My disagreement with the majority is over where that purposive process of construction leads.

To say that the language of the statute alone does not answer the question of construction, however, does not mean that the language does not at least suggest an answer. The statute requires that the offer be for "a

sum certain." From the plaintiff's point of view, a unified offer to multiple defendants is for "a sum certain." From the defendants' points of view, however, it is difficult to regard such an offer as "a sum certain" because it requires each defendant, within thirty days of the offer, either to accept the offer and thereby leave all the other codefendants free of any liability or, as is more likely to be the case in the real world of litigation, to attempt to secure some unspecified contribution from all or some of those codefendants.[2] Thus, as a practical matter, no one defendant, faced with a unified offer of judgment, can realistically evaluate its own exposure created by that offer—namely, the potential for a substantial interest penalty—without that exposure being compared to that of the other defendants and to their own calculations of their own exposures. From the defendants' point of view, that does not strike me as a strained meaning of "a sum certain."

In my view, therefore, this language tilts somewhat in favor of the defendants' reading of the statute. Reading this language in light of the purpose of the statute reinforces the linguistic suggestion that the statute does not contemplate a unified offer of judgment to multiple defendants.

The statute has a two part purpose: (1) to promote fair and reasonable settlements, and (2) to do so by

[2] We employed much the same reasoning in rejecting a claim of a plaintiff that partial settlements with other defendants should not reduce the plaintiff's "recovery" under § 52-192a. Thus, in *Civiello* v. *Owens-Corning Fiberglass Corp.*, 208 Conn. 82, 92, 544 A.2d 158 (1988), we stated that "where there are multiple defendants, no one of them would ordinarily be inclined to accept an offer of judgment for a sum approaching the full amount of damages likely to be awarded to a plaintiff, unless the likelihood of his being held solely liable were extreme. . . . In such a situation each defendant would have little incentive to accept such an offer because of his expectation that some other defendant would eventually contribute to the reduction of his potential exposure for damages by pretrial settlement or by apportionment of responsibility in the ultimate judgment. See General Statutes §§ 52-572h (c), 52-572o."

penalizing the failure to accept an offer of judgment that later turns out to have been reasonable, gauged by the fact that it is less than the ultimate judgment. "[T]he purpose of § 52-192a . . . is the promotion of fair and reasonable pretrial settlements, and, consequently, the conservation of judicial resources." *Lutynski* v. *B. B. & J. Trucking, Inc.*, 31 Conn. App. 806, 811, 628 A.2d 1 (1993), aff'd, 229 Conn. 525, 528, 642 A.2d 7 (1994) (adopting Appellate Court's "thoughtful and thorough unanimous opinion"). "The statute is . . . punitive in nature. . . . It is the punitive aspect of the statute that effectuates the underlying purpose of the statute and provides the impetus to settle cases." (Citations omitted.) *Lutynski* v. *B. B. & J. Trucking, Inc.*, supra, 812–13.

This punitive aspect has been repeatedly recognized in the cases applying § 52-192a. See, e.g., *Camp, Dresser & McKee, Inc.* v. *Technical Design Associates, Inc.*, 937 F.2d 840, 845 (2d Cir. 1991) (award under § 52-192a "punitive" in nature); *Boulevard Associates* v. *Sovereign Hotels, Inc.*, 861 F. Sup. 1132, 1141 (D. Conn. 1994) (award under § 52-192a "punitive in nature"); *Murphy* v. *Marmon Group, Inc.*, 562 F. Sup. 856, 859 (D. Conn. 1983) (§ 52-192a imposes "increased penalty"); *Civiello* v. *Owens-Corning Fiberglass Corp.*, 208 Conn. 82, 91, 544 A.2d 158 (1988) (§ 52-192a provides "interest penalty"); *Paine Webber Jackson & Curtis* v. *Winters, Inc.*, 22 Conn. App. 640, 651, 655, 579 A.2d 545, cert. denied, 216 Conn. 820, 581 A.2d 1055 (1990) (§ 52-192a is "procedural rule, punitive in nature" that creates "penalty" for wasting state's judicial resources); *Gillis* v. *Gillis*, 21 Conn. App. 549, 554, 575 A.2d 230, cert. denied, 215 Conn. 815, 576 A.2d 544 (1990) (§ 52-192a award "punitive" in nature); *Edward Denike Tree Co.* v. *Butler*, 21 Conn. App. 366, 369, 573 A.2d 349 (1990) (award under § 52-192a "punitive" in nature); *Crowther* v. *Gerber Garment Technology, Inc.*, 8 Conn.

App. 254, 267, 513 A.2d 144 (1986) (§ 52-192a award "punitive" in nature).

The punitive, as opposed to compensatory, aspect of the statute lies in the fact that the consequence of a defendant's failure to accept such an offer of judgment is an award of interest on the ultimate judgment at the statutory rate of 12 percent from the date of the complaint or offer, depending on when the offer was made. That is a rate of interest above the statutory rate for either prejudgment or postjudgment interest, and it is awarded over and above any award of prejudgment interest, as in the present case. See, e.g., *Black* v. *Goodwin, Loomis & Britton, Inc.*, 239 Conn. 144, 164–65, 681 A.2d 293 (1996). Thus, the statute goes beyond the normal purpose of interest, which is to compensate the plaintiff for the loss of the use of money, and is intended to impose a penalty on the defendant for its failure to accept the offer of judgment. Indeed, in this case the penalty was so great—approximately $533,000—that it exceeded by almost $100,000 the entire compensatory award of damages and discretionary prejudgment interest—approximately $434,000.

We generally interpret penal, as opposed to compensatory, statutes "with reasonable strictness in determining whether the act complained of comes within the description in the statute of the acts for which the person in fault is made liable." (Internal quotation marks omitted.) *Freeman* v. *Alamo Management Co.*, 221 Conn. 674, 684, 607 A.2d 370 (1992). That same principle should apply to the interpretation of § 52-192a involved in the present case.

I recognize that the statute can plausibly be read as the majority reads it. What the majority overlooks, however, is that it can also be read at least as plausibly—and in my view, more plausibly—the other way. I also recognize that, read either way, the statute will

present some practical difficulties in its application by plaintiffs or defendants in those situations, like this case, not specifically contemplated by the legislature. Moreover, read *either* way—as permitting at the plaintiff's option a unified offer of judgment, or requiring separate offers of judgment to multiple defendants—the *first* purpose of the statute, namely, the promotion of reasonable and fair settlements, will be promoted.

The *second* purpose, however, namely, its punitive aspect, counsels strongly in favor of reading the statute with reasonable strictness against the party who seeks to take advantage of it, so as to require separate offers of judgment to multiple defendants. The burden of the ambiguity of the statute and of any practical difficulties in deciding how to interpret it should fall on the party who will gain from its punitive consequence, rather than on the party who will suffer that consequence.

Furthermore, requiring a plaintiff to make individual offers of judgment to multiple defendants will not impose significant burdens on the plaintiff. The plaintiff, after all, has the general burden of establishing the liability of and amount of damages to be paid by each defendant against whom he claims. I see no reason why the plaintiff should not also be required to structure separate offers of judgment against those same defendants, whether he seeks a "global settlement" of the case or individual settlements, especially when he stands to gain more than his just compensatory damages as a result of that process.[3]

---

[3] In this connection, the majority, purporting to quote from the brief of the amicus curiae, asserts that "the Connecticut Defense Lawyers Association, which filed an amicus brief in support of Aetna's position on unified offers of judgment, recognized that exceptions could be carved out of a rule prohibiting unified offers in appropriate cases, 'where the relationship among plaintiffs or among defendants is so strong that they should not be considered "multiple parties," but instead a single party, for purposes of the offer of judgment procedure.'"

The majority goes on to criticize this approach, implicitly asserting that the Connecticut Defense Lawyers Association has *endorsed* the above posi-

This interpretation is consistent with the cases in other jurisdictions that have considered the issue under their offer of judgment statutes. *Yada* v. *Simpson*, Nev. , 913 P.2d 1261, 1263 (1996) (unified offer of judgment to multiple defendants not permitted because "[s]uch an offer of judgment does not serve to encourage settlement since the individual defendants are unable to determine their share of a joint offer and make a meaningful choice between accepting the offer or continuing to litigate"); *Morgan* v. *Demille*, 106 Nev. 671, 673–74, 799 P.2d 561 (1990) (unified offer of judgment by multiple plaintiffs not permitted); *Ritt* v. *Dental Care Associates, S.C.*, 199 Wis. 2d 48, 76, 543 N.W.2d 852 (1995) ("single offer of one aggregate settlement figure to multiple defendant tortfeasors is not valid . . . because it does not permit each defendant to evaluate the offer from the perspective of that defendant's assessment of his or her own exposure"); see *Brinker-hoff* v. *Swearingen Aviation Corp.*, 663 P.2d 937, 943 (Alaska 1983) (unified offer of judgment to multiple defendants not permitted); *Taing* v. *Johnson Scaffold-*

---

tion. The passage in that brief to which the majority refers, however, cannot plausibly be read as advocating any such exceptions. The amicus was simply offering for consideration a possible scenario, not presented by this case, in which one other jurisdiction has created an exception to the rule supported by the amicus.

The passage in the brief of the amicus to which the majority refers was part of a footnote in which the amicus points out that the questions that we formulated for consideration by the amici did not refer to "any relationship among plaintiffs or defendants in a given case. Amicus curiae has responded with a discussion of the general rule that must obtain under the existing statute and rules. Like most general rules, there remains room, in an appropriate case, for the court to carve out an exception where the relationship among plaintiffs or among defendants is so strong that they should not be considered 'multiple parties,' but instead a single party, for purposes of the offer of judgment procedure. The California courts have gone so far as to turn this *possible exception* to the general rule into the rule itself. See, e.g., *Santantonio* v. *Westinghouse Broadcasting Co.*, [25 Cal. App. 4th 102, 30 Cal. Rptr. 2d 486 (1994)]. Even under the California rule, however, the multiple defendants in the [present case] could not be considered a single entity." (Emphasis added.)

*ing Co.*, 9 Cal. App. 4th 579, 586, 11 Cal. Rptr. 2d 820 (1992) (where plaintiff makes offer of judgment against multiple defendants, "the offer to any defendant against whom the plaintiff seeks to extract penalties for non-acceptance must be sufficiently specific to permit that individual defendant to determine the exact amount [the] plaintiff is seeking from him or her"); *Taylor v. Clark*, 883 P.2d 569, 570 (Colo. App. 1994) (offer of judgment statute does not apply when defendant "make[s] an offer of settlement to two plaintiffs that does not specifically apportion the settlement amount between the plaintiffs"); *True v. T & W Textile Machinery, Inc.*, 112 N.C. App. 358, 360, 435 S.E.2d 551 (1993) (when "multiple plaintiffs . . . have independent claims for relief . . . an offer of judgment [by a defendant] can be valid only if it is specific as to the offer made to each plaintiff").[4]

The majority argues that, in this case, the defendant Aetna Insurance Company (Aetna) was able adequately to assess its own exposure in relation to the amount of the unified offer, implying that, from Aetna's perspective, the offer of judgment of $300,000 should have been deemed reasonable and should have been accepted, even though in doing so the action would have been settled against the other defendants. See footnote 40

---

[4] Two courts have carved out limited exceptions to this general rule. See, e.g., *Santantonio v. Westinghouse Broadcasting Co.*, 25 Cal. App. 4th 102, 114–15, 30 Cal. Rptr. 2d 486 (1994) (multiple plaintiffs may make unified offer of judgment when interests are "identical," and single plaintiff may make unified offer of judgment against several defendants when those defendants are sued under theory of joint and several liability); *Testa v. Farmers Ins. Exchange*, 164 Wis. 2d 296, 303, 474 N.W.2d 776 (1991) (single offer of judgment to multiple defendants permissible when multiple defendant tortfeasors are jointly and severally liable to plaintiff, defendants are all covered by same insurance policy, and offer is within insurance policy's limits). No court, however, has read its jurisdiction's statute, as the majority has in the present case, to leave solely in the hands of the plaintiff, or the plaintiffs, the choice as to whether to make a unified offer or individualized offers of judgment.

of the majority opinion. This is nothing more than the benefit of 20/20 hindsight.

The actual damages awarded to the plaintiff against Aetna were *less than* the $300,000 offer of judgment. The actual damages award was $297,317.69, and the ultimate judgment exceeded the offer of judgment only because the trial court, in its discretion pursuant to General Statutes (Rev. to 1983) § 37-3a,[5] awarded prejudgment interest of approximately $137,000. See footnote 6 of the majority opinion. I fail to see the reasonableness of the plaintiff's offer of judgment in this factual scenario. Indeed, this was the classic case that we contemplated in *Civiello* v. *Owens-Corning Fiberglass Corp.*, supra, 208 Conn. 92, wherein we stated that "where there are multiple defendants, no one of them would ordinarily be inclined to accept an offer of judgment for a sum approaching the full amount of damages likely to be awarded to a plaintiff, unless the likelihood of his being held solely liable were extreme."[6]

It is true that, in the present case, it was the discretionary prejudgment interest award that pushed the ultimate judgment over the amount of the offer of judgment. That is the result of earlier interpretations of § 52-

[5] General Statutes (Rev. to 1983) § 37-3a provides in relevant part: "Except as provided in sections 37-3b and 52-192a, interest at the rate of eight per cent a year, and no more, may be recovered and allowed in civil actions or arbitration proceedings under chapter 909, including actions to recover money loaned at a greater rate, as damages for the detention of money after it becomes payable . . . ."

[6] Furthermore, the majority's assertion that Aetna could always recover against its principal; see footnote 41 of the majority opinion; contains two flaws as an argument for the majority's interpretation of the statute. First, even in a case such as this, where there is a theoretical right of recovery, as a practical matter I doubt its viability in the construction trades. Indeed, the difficulty of recovering against contractors is one of the principal reasons for requiring payment and performance bonds such as that supplied by Aetna in this case. Second, any such right of recovery by a surety against its principal disappears in the usual tort or contract action to which § 52-192a applies as a general matter.

192a requiring the inclusion of prejudgment interest in the comparison between the offer of judgment and the amount of the award. See footnote 35 of the majority opinion. It is also true that Aetna's liability under the statute flows from that factor, and not from the fact that the offer of judgment was unified rather than individualized.

Under the majority's statutory regime, however, not only must a defendant who is faced with an offer of judgment calculate, within a thirty day period, the likelihood of the damage award against him and, in a case in which compensatory prejudgment interest may be awarded, the likelihood and amount of such an award, but the defendant must now make that calculation, based not solely on its own interests and exposures, but also based on a calculation that is inextricably linked to those of his codefendants. This, in my view, transforms a statutory penalty scheme into a statutory bludgeon, and goes beyond a sound interpretation of that scheme.

Thus, the majority has put all of the weapons created by § 52-192a in the hands of the plaintiff, with practically no risk,[7] and all of the exposure on the defendant. I recognize that much of that allocation is the result of the statutory scheme, which is aimed at encouraging settlements upon pain of certain penalties. By interpreting the statute to add another layer of advantage to the plaintiff—the plaintiff alone, for whatever tactical reasons, can decide whether to make a unified or individualized offers of judgment—the majority has, in my view, construed a penal statute broadly against the party penalized, rather than strictly against the party seeking to gain by the penalty.

---

[7] It cannot be plausibly maintained, as the majority suggests, that the plaintiff's potential exposure to attorney's fees in the amount of $350 and subsequent costs, constitutes a significant disincentive, in most cases of any significance, to the plaintiff's making an offer of judgment that turns out to be less than his ultimate recovery.

I would, therefore, reverse that part of the judgment that awarded interest under § 52-192a.